**SHAWMUT WORCESTER COUNTY BANK, Plaintiff,**

v.

**FIRST AMERICAN BANK & TRUST, Michael Woods, and Joseph Merle, Defendants.**

**Civ. A. No. 87–0048–XX.**

United States District Court,
D. Massachusetts.

Feb. 5, 1990.

**58**

A.W. David LaVigne, Boylston, Mass., for plaintiff.

John J. Rosenberg, Friedman & Atherton, Boston, Mass., and Peter W. Homer and Marjorie E. Murphy, Greer, Homer, Cope & Bonner, P.A., Miami, Fla., for defendants.

Oliver C. Mitchell, Jr., Ravech, Aronson & Shuman, Boston, Mass., for Joseph Merle.

## MEMORANDUM AND ORDER

YOUNG, District Judge.

This action arises out of an error made by the plaintiff, the Shawmut Worcester County Bank ("Shawmut" or "transferor"). As is often the case with bank errors concerning money, restoring the *status quo ante* is somewhat more complicated than the slip that created the problem. In the instant case, Shawmut mistakenly transferred $10,000 from the account of American Optical Corporation, not a party to this action, to First American Bank & Trust in West Palm Beach, Florida ("First American" or "transferee"), purportedly for the benefit of one Fernando Degan ("Degan" or "beneficiary"), also not a party to this action, by means of an Electronic Funds Transfer System known as "Fedwire." Although Degan was the sole named beneficiary of the transfer, the payment order issued from Shawmut to First American also indicated that First American should credit account number 100 205 001 633, an account, it turns out, which is jointly held by Degan and one Joseph Merle. Shawmut discovered its error one hundred six (106) days after the mistaken transfer, credited the account of its customer American Opti-

cal the sum of $10,000.65, and asked First American to "reverse" a "previous day's" transfer, *i.e.*, credit Shawmut the amount mistakenly transferred. First American asked Merle, its customer, if he would authorize the "reversal." Merle refused. Accordingly, American told Shawmut it would not reverse the transfer. Merle has already been adjudicated liable to Shawmut for $10,000. Apparently unsatisfied, Shawmut also seeks judgment against First American and its employee Michael Woods ("Woods").

Shawmut asserts claims of conversion against First American (Count I) and Woods (Count III) in handling the transfer. Shawmut also claims that First American is liable to it for breaching a principal-agent relationship (Count V) and for negligence (Count VI). Finally, Shawmut seeks recovery under rights purportedly derived from a federal statute, the Electronic Funds Transfers Act, 15 U.S.C. sec. 1693 (1982) *et seq.*, (Counts VII, VIII, X, and XI), as well as two Massachusetts statutes: Mass.Gen. Laws ch. 93A (the Massachusetts "consumer protection statute") (Count II) and Mass. Gen.Laws ch. 106 (the Massachusetts Uniform Commercial Code) (Counts XIII and XIV). First American and Woods have moved either to dismiss or for summary judgment with respect to all claims.

■ The first issue concerns the choice of law to be applied to the common law claims. Shawmut argues conclusorily that Massachusetts law applies. Woods and First American do not argue the point. This Court, applying the choice of law rules of the forum state as dictated by *Klaxon Co. v. Stentor Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), here Massachusetts, concludes that Florida law applies.

In Massachusetts, the choice of law in actions such as this depends on a number of factors as set forth in *Bushkin Associates, Inc. v. Raytheon Co.*, 393 Mass. 622, 473 N.E.2d 662 (1985).[1] Here, these criteria all point toward the application of Florida law.

■ Woods and First American are entitled to summary judgment with respect to Shawmut's conversion theory. It is well-settled Florida law that conversion consists of an act in derogation of the plaintiff's possessory rights. The essence of a conversion claim is the wrongful deprivation of identifiable property from a person entitled to possession. *Star Fruit Co. v. Eagle Lake Growers, Inc.*, 160 Fla. 130, 132, 33 So.2d 858, 860 (1948); *E.J. Strickland Construction, Inc. v. Dept. of Agriculture and Consumer Services of Florida*, 515 So.2d 1331, 1335 (Fla.App. 5th Dist.1987). The act must be unauthorized, *Aubin v. Hentz & Co.*, 303 F.Supp. 1119, 1121 (S.D.Fla. 1969) (citing 7 Florida Jurisprudence, Conversion sec. 2), and must involve an interference with legal rights incident to ownership, *West Yellow Pine Co. v. Stephens*, 80 Fla. 298, 304, 86 So. 241, 243 (1920).

Viewing the record before the Court in the light most favorable to Shawmut and indulging all inferences favorably to Shawmut, *Ismert and Associates, Inc. v. New England Mutual Life Ins. Co.*, 801 F.2d 536, 537 (1st Cir.1986), neither First American nor it employee, Woods, effected a conversion of property owned by Shawmut when the bank, through Woods, refused to "reverse" the erroneous funds transfer made 106 days earlier. A conversion occurs at the time the defendants act in derogation of an interest in possession in identifiable goods.[2]

---

1. In deciding which law to apply, the courts are to examine those perimeters set forth in the Restatement of Conflicts of Laws, sec. 6(2), which include a) the needs of the interstate and international systems; b) relevant policies of the forum; c) relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; d) protection of justified expectations; e) the basic policies underlying the particular field of law; f) certainty, predictability and uniformity of result, and g) ease in the determination and application of the law to be applied. *Bushkin*, 693

Mass. at 632, 473 N.E.2d 662. Alternately, a court can consider other factors, such as simplification of the judicial task, advancement of the forum's governmental interests, and application of the better rule of law. *Bushkin*, 693 Mass. at 634, n. 7, 473 N.E.2d 662.

2. Assuming, *arguendo*, that the erroneous $10,000 transfer was still "identifiable" 106 days later and so otherwise capable of being converted at that time, there is here no evidence that on November 25, 1986, Shawmut was entitled to the immediate possession of that $10,000 mis-

No conversion took place by virtue of the acts of August 11, 1986, the day of the transfers, since First American was authorized to act, that is, to execute the payment orders issued by Shawmut. Likewise, no conversion took place on November 25, 1986, the day Shawmut first requested that First American "reverse" the erroneous transfer, because, as of November 25, Shawmut had no possessory rights in the mistaken transfer. By then the money had been "finally paid" by First American's Federal Reserve bank to First American, which extinguished Shawmut's "ownership interest" in the funds as personal property. Put another way, by November 25, 1986, there was no longer any property owned by Shawmut which was subject to conversion by First American. Therefore, Woods and First American are entitled to summary judgment with respect to the conversion counts, Counts I and III.

▮ Shawmut's second common law claim alleges that First American breached its duties as Shawmut's agent (1) in handling the August 11 transfers and (2) in refusing to "reverse" the erroneous transfer on November 25. On August 11, First American was undoubtedly the receiving agent for its customers, Merle and Degan, for purposes of receiving the transfer and crediting the account. *See Delbrueck & Co. v. Manufacturers Hanover Trust Co.,* 609 F.2d 1047, 1051–52 (2d Cir.1979); *see also* 12 C.F.R. 210 (1989). Shawmut, however, alleges that First American was also acting as Shawmut's agent for purposes of the transaction and it was in this capacity that First American was negligent in discharging its duties. *See Securities Fund Services, Inc. v. American Nat. Bank & Trust Co. of Chicago,* 542 F.Supp. 323, 327 (N.D.Ill.1982) (a "corresponding bank," which regularly performs services for another in a market to which the other does not have direct access, may be an "agent" for the initiator of a wire transfer).

Shawmut claims that the pattern of dealings between the banks establishes a general agency between them, with no limiting dimension, that extended at least until November 25, one hundred six days after the August 11 transactions, and that it was within the scope of First American's duties as Shawmut's agent to "reverse" the transaction at that time. This view is not supported by the undisputed facts. The record before the Court is insufficient to establish the existence of any principal-agent relationship between Shawmut and First American. Scrutiny of all attendant facts surrounding the relationship between these banks reveals that, unlike the scenario in *Securities Fund,* First American was not operating as a "correspondent bank" for Shawmut. It is simply an independent bank, like Shawmut, that maintains an account with the Federal Reserve System and, like Shawmut, participates in the national Federal Reserve Wire Network ("Fedwire") facilitating electronic fund transfers between financial institutions on behalf of the financial institutions' customers. *See generally* Geva, Fedwire Transfer of Funds, 104 Banking Law Journal 412 (1987). Participants in Fedwire transfers like the one in this case are bound, to be sure, to conform their conduct to the standards prescribed by Fedwire regulations. *See* 12 C.F.R. sec. 210.25–38 ("Subpart B of Regulation J"). Subpart B of Regulation J governs the wire transfer of credits and debit of funds and preempts all conflicting state laws and private contract provisions. *See* D. Baker & R. Brandel, *The Law of Electronic Fund Transfer Systems* at 19–14 (2d Ed.1988). A difficult hurdle that Shawmut has failed to negotiate in establishing an agency relationship is that under Regulation J the transferor bank, Shawmut, did not have the right to control First American's conduct with respect to the original crediting of the account specified in the payment order. Under Regulation J, the transferor bank, in making a request for a transfer, authorizes its Reserve Bank

---

takenly transferred. Its rights in the money, if any, were in the nature of a chose in action to recover the money mistakenly paid over. The sole right to possession of that money, at that time, was in the holders of the account to which

the $10,000 was deposited, and still remained. Had First American removed $10,000 from that account without authority, it could well have effected a conversion, because Degan and Merle arguably had possessory rights in the money.

to debit its account for the amount of funds to be transferred and further authorizes the transferee institution's Reserve Bank to credit the same amount to the transferee bank. Any request by a transferor to interrupt the carrying out of a funds transfer must be made to the transferee's Reserve Bank, not to the transferee. Even then, that Reserve Bank is not obligated to accomodate the transferor, but may do so if the request is made in time to give the Reserve Bank a reasonable opportunity to comply, 12 C.F.R. sec. 210.35(a)—that is, before it makes final payment to the transferee receiving bank. This legal limitation on the powers of the purported principal is fatal to Shawmut's agency theory.

■ In the alternative, this Court rules that even if an agency relationship existed between a transferor bank and a transferee bank in transactions of this kind, it is necessarily circumscribed by the parties' respective obligations as set out in Regulation J. *See* 12 C.F.R. sec. 210.27(b). Any agency a transferor bank may be said to have with a transferee bank ends at the time of final payment by the transferee bank's Reserve bank, *see* 12 C.F.R. sec. 210.36, because a transferee that receives such notice agrees only to credit promptly the beneficiary's account or otherwise make the amount available to the beneficiary, 12 C.F.R. sec. 210.30(b). As matter of law, this is the permissible scope of the agency. At the time the transfer item is finally paid, the transferee bank becomes the beneficiary's receiving agent and any obligations as "agent" for the transferor bank are limited to crediting promptly the beneficiary's account. *See Delbrueck & Co. v. Manufacturers Hanover Trust*, 609 F.2d at 1051–52. In this case, as First American's Reserve Bank had made final payment to it, First American was not obliged by any applicable principle of agency law to "reverse" a transaction made 106 days earlier by reaching into its client's account for the money.

■ Shawmut grasps at one final straw in supporting its agency theory. It claims that on August 11, 1986, First American breached its fiduciary duty as Shawmut's agent by failing to act in strict accordance with Shawmut's instructions, instead crediting a jointly held account, where only one account holder was the actual beneficiary. Shawmut claims that First American's failure to inform its principal of Merle's status as joint holder in the account number indicated on the payment order amounts to a breach of First American's fiduciary duties as an agent toward it with regard to that discrete transaction. It is undisputed that Shawmut's instructions, contained in the payment order, were to credit Fernando Degan. It is also undisputed that the payment order also gave the account number to which the deposit should be made, which was the joint account of Degan and Merle. Even assuming, contrary to the conclusion that this Court reaches as matter of law above, that a jury could find an agent-principal relationship existed between Shawmut and First American on August 11, no reasonable jury would be warranted, on these facts, in concluding that First American had a duty to disclose the joint ownership of the account to which Shawmut expressly, albeit erroneously, transferred funds. *See* Restatement (Second) of Agency sec. 381; *see also Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986). Accordingly, summary judgment must enter for First American on Count V, alleging a breach of the principal-agent relationship.

■ Shawmut's claim based on rights allegedly secured by the Electronic Funds Transfer Act, 15 U.S.C. sec. 1693 (1982) ("Transfer Act") is also without merit. Although the statute does indicate that a subsidiary purpose of the Transfer Act is to "provide a basic framework establishing the rights, liabilities and responsibilities of participants in [electronic funds transfer] systems," the Transfer Act was primarily created for the especial benefit of consumers. 15 U.S.C. sec. 1693(b). The Transfer Act evidently is aimed at providing a framework of law regulating the rights of consumers as against financial institutions in electronic funds transfers. The Transfer Act contains civil remedies only for consumers, with "consumers" being statu-

torily defined as "natural persons." 15 U.S.C. sec. 1693a(5).

This dispute is between two financial institutions and there is no evidence before the Court, even after ample discovery, that First American "directly or indirectly holds an account belonging to a consumer" that conceivably might create the kind of financial institution and consumer relationship between First American and Shawmut that the Act regulates. *See* 15 U.S.C. sec. 1693a (8). In the absence of such evidence, it is evident that this sort of funds transfer—a garden-variety wire transfer between financial institutions—is specifically excepted from Transfer Act coverage by the provisions of section 1693a(6)(B). *See Bradford Trust Co. v. Texas–American Bank–Houston,* 790 F.2d 407 (5th Cir.1986) (Transfer Act does not apply to a wire of funds from an account held by a Boston bank to a Houston bank for the benefit of a Houston bank customer). Therefore, summary judgment must now be entered for Woods and First American on counts VII, VIII, X, and XII which allege a cause of action under the Transfer Act.

██ The counts that rest on the application of Massachusetts statutory law to this interbank dispute must also be dismissed. The provisions of the Massachusetts Consumer Protection Act, as amended, Mass.Gen.Laws ch. 93A, sec. 11 (1989), preclude application of that Massachusetts statute to this dispute, since the transaction constituting the alleged unfair or deceptive act or practice—First American's refusal to act on Shawmut's belated "reversal" request—occurred in Florida.[3] Since the conduct complained of did not occur "primarily and substantially within the Commonwealth [of Massachusetts]," this action cannot be maintained under Mass. Gen.Laws ch. 93A. The Massachusetts version of the Uniform Commercial Code has no application in the premises since Mass.Gen.Laws ch. 106, sec. 4–102(2) specifically states that "[t]he liability of a bank for action or non-action with respect to any item handled by it for purposes of presentment, payment or collection is governed by the law of the place where the bank is located." First American, the bank whose liability for action or non-action is at issue here, is located in Florida. Therefore, if electronic funds transfers are governed by the Uniform Commercial Code, the law of Florida and the Florida Commercial Code, Fla.Stat. chapters 671–673 (1966), applies. The Circuits that have considered the matter have uniformly concluded that the Uniform Commercial Code does not apply to Electronic Funds Transfers, except perhaps by analogy. *See Delbrueck & Co. v. Manufacturers Hanover Trust Co.,* 609 F.2d 1047 (2d Cir.1979), *Evra Corp. v. Swiss Bank Corp.,* 673 F.2d 951 (7th Cir. 1982), *Bradford Trust,* 790 F.2d at 409. An electronic funds transfer is not within Article 3 of the Uniform Commercial Code because it is not a signed negotiable instrument. *See* Fla.Stat. secs. 673.3–102(1)(e); 673.3–104; 673.3–401; Mass.Gen.Laws ch. 106, secs. 3–102(1)(e); 3–104; 3–401. Although the language of Article 4 could be stretched to include electronic funds transfers, they were surely not within the contemplation of the draftsmen. *Evra Corp. v. Swiss Bank Corp.,* 673 F.2d 951, 955 (7th Cir.1982); *see also Delbrueck & Co. v. Manufacturers Hanover Trust Co.,* 609 F.2d 1047 (2d Cir.1979) (Article 4 inapplicable to interbank wire transfer dispute, although Commercial Code finality concepts support irrevocability of electronic funds transfers).

What remains is the negligence claim (Count VI). The state of the common law in regard to electronic funds transfers generally and the liabilities concomitant to erroneous payment orders in particular is not yet well developed. There is no comprehensive body of law to define the rights and obligations that arise from wire transfers. More particularly, Florida decisions offer no specific guidance on the negligence issue in these circumstances.

---

**3.** That section provides:

No action shall be brought or maintained under this section unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth.

Mass.Gen.Laws ch. 93A, sec. 11.

Were it Massachusetts common law that supplied the rule of decision here, this Court could turn confidently to the American Law Institute Restatements as they so frequently guide the growth of the common law in this Commonwealth. *See Recent Developments in Federal and Massachusetts Law* (MCLE, Inc., 1989), sec. X; *Recent Developments in Massachusetts Law* (MCLE, Inc.1985), sec. III; *Recent Developments in Massachusetts Law* (MCLE, Inc.1984), sec. III. Florida common law decisions do not, however, so frequently advert to the Restatements. This Court is not nearly so sure, therefore, that the Florida Supreme Court will follow the Restatements as adopted. Nevertheless, given the dearth of decided cases, this Court will be guided—subject to reconsideration in the manner discussed below—by the American Law Institute, Proposed Article 4A, Uniform Commercial Code, Proposed Final Draft (April 20, 1989) ("ALI Article 4A").[4]

■ Shawmut argued first that First American was negligent in facilitating payment to an account number not peculiarly identified to the name of the transfer beneficiary. This is precisely the argument the Court has already considered—and rejected as matter of law—in evaluating whether First American violated any duty imposed on it as a possible agent of Shawmut. *Supra* at 61. The same result follows in the negligence context under the American Law Institute proposal. ALI Article 4A–209(3)(b) provides that duplicate transfers[5] may be subject to cancellation if the sender discovers a mistake has been made.[6] Section 4A–209(3) also cross references Fed-

wire rules, and reads, in pertinent part, as follows:

(3) Cancellation or amendment of a payment order accepted by the receiving bank is effective only if the bank agrees or a funds transfer system rule allows cancellation or amendment without agreement of the bank....

Fedwire rules do not permit a cancellation, "revocation," or "reversal" of a previous day's funds transfer without permission of the receiving bank. The transferree or receiving bank is under no obligation under Regulation J to comply with a request, even if the transferor provides indemnity. 12 C.F.R. sec. 210. Both the ALI Article 4A and the Fedwire rules recognize that even with indemnity, the beneficiary's bank may be reluctant to alienate its customer, the beneficiary, by denying the customer the funds. *See* ALI Article 4A–209, Comment 5.[7] The language of section 4A–209 is permissive, not mandatory, where, as here, the funds transfer system rules do not permit cancellation without the permission of a receiving bank. Even if a receiving bank is the sender's "agent" on the day of the transfer, the regulatory framework that undergirds the parties' relationship cannot support the conclusion that the receiving bank is an agent for the sender charged with a duty broader than simply to credit promptly the beneficiary's account. The policies underlying this arrangement are even more compelling where a sending bank requests cancellation of a payment order three and one half months after the receiving bank has credited its customer's account. This Court rules that, as matter of law, a receiving bank is not negligent where it credits a

---

4. Subject to recommendations made at the meeting of the Institute, this draft has been approved by it and, as revised, has been subsequently approved by the National Conference of Commissioners on Uniform State Laws. 12 ALI Reporter 10 (Oct. 1989).

5. It is undisputed that the erroneous transfer here was the duplicate of an earlier transfer which is not in question.

6. This section reads as follows:
(b) With respect to a payment order accepted by the beneficiary's bank, cancellation or amendment is not effective unless the pay-

ment order was issued ... because of a mistake by a sender in the funds transfer which resulted in the issuance of a payment order (i) that is a duplicate of a payment order previously issued by the sender....
ALI Article 4A–209(3)(b).

7. Note that the commentary to Article 4A–209 is being expanded beyond what is contained in the draft "to make it clear that when a Fedwire is received, that constitutes acceptance of the payment order by the receiving bank." 12 ALI Reporter 10 (Oct. 1989).

payment order to the joint account as set out in the order.

■ Shawmut next argues that First American should have acted to prevent the reasonably foreseeable harm that proximately resulted from its negligent failure to notice that Shawmut's second payment order was a mistake and duplicative. The issue before the Court, thus, is whether First American was somehow put on notice that the transaction was so irregular that it should have investigated the circumstances prior to crediting the account a second time.

If Shawmut's own contributory negligence is put to one side for a moment, this last argument has some appeal. As a practical matter, the receiving bank probably is in a better position to recover the funds from the beneficiary, especially where the beneficiary is a customer of that bank. It thus makes sense that the risk of loss for duplicative payment orders such as the one involved in the instant case be shifted in some instances to a bank which blithely executes payment orders without exercising even ordinary care. The American Law Institute is considering this matter. *See* ALI Article 4A–205 permitting such a shift of the risk of loss where the sender can show that it complied with applicable security procedures and that the error would have been detected by the receiving bank had that bank complied with similar security procedures.[8] Here, however, there is no evidence before the Court that First American failed to comply with one of its own security procedures and no evidence that the lack of a reasonable security procedure may have caused the error to have gone undetected.

■ Before judgment enters, however, one matter may require further consideration. In disposing of the negligence claim, the Court has relied upon ALI Article 4A. Its reasoning depends on the following conclusions, one legal and the other factual, *viz*:

1. that the Florida Legislature or Supreme Court will adopt or follow the American Law Institute proposal, and

2. that no applicable security procedure was followed by Shawmut and ignored by First American.

Because the parties could have no inkling that the Court would apply ALI Article 4A to this case, they have not briefed either of the above matters. Fairness requires they be given an opportunity to do so as well as the opportunity to consider whether a certification of the legal issue to the Supreme Court of Florida is appropriate. Accordingly, the parties shall have thirty (30) days from the date of this memorandum to address these issues by briefs and affidavits. Should none be received, judgment will enter for Woods and First American. Should either party brief these issues, however, the Court will reconsider the negligence point.

SO ORDERED.

---

**8.** ALI Article 4A–201 defines a "security procedure" as a procedure established by agreement of a customer and a receiving bank (or "transferee") for the purpose of detecting error in the transmission or the content of payment orders. The question of whether the loss resulting from the transmission of an erroneous payment order will be borne by the sender or by the receiving bank is affected by whether a security procedure was or was not in effect and whether there was or was not compliance with the procedure.