972 F.2d 338
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
BROTHERS TRADING COMPANY, INCORPORATED, an Ohio corporation,
Plaintiff-Appellant,
v.
CHARLESTON NATIONAL BANK, a national banking association,
Defendant-Appellee,
and
George J. Russell, an individual, Defendant.
 No. 91-2712.
 United States Court of Appeals,
Fourth Circuit.
 Argued: May 4, 1992
Decided: August 6, 1992
 
 Appeal from the United States District Court for the Southern District of West Virginia, at Charleston.
 Charles Duncan Dunbar, JACKSON & KELLY, for Appellant.
 William Walter Booker, KAY, CASTO, CHANEY, LOVE & WISE, for Appellee.
 Ellen S. Cappellanti, JACKSON & KELLY, for Appellant, on brief.
 S.D.W.Va.
 REVERSED AND REMANDED.
 Before PHILLIPS and NIEMEYER, Circuit Judges, and KAUFMAN, Senior United States District Judge for the District of Maryland, sitting by designation.
 PHILLIPS, Circuit Judge:
 
 OPINION
 
 1
 Brothers Trading Company (Brothers) appeals a district court order granting summary judgment for the Charleston National Bank (CNB) on Brothers' claim that CNB negligently breached its duty of care in handling funds wired in error by Brothers to CNB's customer, George Russell. Because we believe CNB owed a duty of care to Brothers and because we believe genuine issues of material fact remain regarding whether CNB breached its duty and proximately caused Brothers' loss of the wired funds, we reverse.
 
 I.
 
 2
 Brothers is a wholesale grocery distributor that purchases commodities by making wire transfers through the Federal Reserve Wire System (FedWire). Brothers typically originates wires with the Star Bank in Cincinnati, Ohio. Banks utilizing FedWire use repetitive account numbers to identify beneficiaries of wire transfers. Russell's repetitive account number at CNB was similar to the repetitive number assigned to a Brothers supplier (Supplier) by Star Bank.
 
 
 3
 In early 1988, Star Bank's wire clerk mistakenly transposed the second and third numbers in Supplier's repetitive number on a wire transfer intended for Supplier. The incorrect number corresponded to Russell's account number at CNB. After Supplier notified Brothers that it had not received its wire, Brothers discovered that the funds had been credited to Russell's account. At the time of the mistaken transfer, Russell's account had been inactive for a long period of time. Prior to the credit for the wire transfer, Russell's account reflected a zero balance, and the forecasted evidence indicated that previously he had asked CNB to close his account.
 
 
 4
 Star Bank asked CNB to reverse the wire transfer. Betty Tawney was CNB's wire clerk on duty at the time of this and subsequent transfers involved in this litigation. When Tawney received Star Bank's reversal request, she put a hold on Russell's account and contacted Russell. Russell informed Tawney that the wired funds did not belong to him, and Tawney returned Brothers' funds by wire.
 
 
 5
 Two weeks later, Star Bank again mistakenly transposed the numbers in Supplier's repetitive number, and funds were again wired to Russell's account at CNB. Tawney received Star Bank's reversal request for these funds. She contacted Russell, received confirmation that the funds were not his, and returned the funds to Star Bank.
 
 
 6
 Seven months later, on Friday, September 16, 1988, a Brothers' employee transposed the numbers, and Star Bank again mistakenly ordered funds transferred to Russell's account at CNB. CNB received the wire after business hours on Friday. On the following Monday, September 19, 1988, Tawney processed the wire transfer and deposited $196,751.24 into Russell's account. Tawney recognized that the wire transfer was similar to the two she had reversed seven months earlier. On Tuesday, September 20, Tawney received a reversal request from Star Bank, and she put a temporary hold on Russell's account. Tawney tried to contact Russell for permission to reverse the funds, but someone at Russell's home told Tawney that Russell was out of town. On the same day, Tawney notified Star Bank that CNB could not reverse the funds since it had not obtained permission from Russell. Tawney's message to Star Bank suggested that Brothers should try to contact Russell.
 
 
 7
 Tawney was not at work on Wednesday and Thursday, September 21 and 22. On Wednesday, the temporary hold on Russell's account expired. Tawney returned to work on Friday, September 23, and she discovered a zero balance in Russell's account, indicating that the wired funds had been withdrawn. CNB's records reflect that Russell wrote a check on his account on September 22 and purchased a cashier's check for the full amount of the wire transfer. Russell used the cashier's check to buy securities from CNB's investment department on September 26. These funds remained invested with CNB until October 17, 1988, when CNB issued Russell a cashier's check for $197,548.69.
 
 
 8
 On September 26, Star Bank sent another reversal request to CNB. CNB, through Tawney, responded:
 
 
 9
 I have not received the authorization by Mr. George Russell to return this wire. Will return as soon as he gives me the o.k.
 
 
 10
 (J.A. 235). Around the same time that Tawney received the reversal request, she spoke with Russell at the bank. Tawney testified that during the conversation, Russell said he intended to return the money to Brothers. CNB did not notify Star Bank or Brothers about Russell's withdrawal of the funds or his stated intention to return the money.
 
 
 11
 Brothers negotiated with Russell for the return of the funds, but Russell repaid only $10,000. Brothers then brought this diversity action against CNB.[1] Brothers sought judgment for $186,751.24 plus interest against CNB based on CNB's negligence and its failure to comply with reasonable commercial banking standards. The district court, granting summary judgment for CNB, found that CNB properly deposited the funds into Russell's account. The court granted summary judgment on the grounds that CNB owed no duty to protect Brothers' assets and, even if CNB owed such a duty, Brothers' inaction, not CNB's breach, proximately caused Brothers' loss.
 
 II.
 
 12
 We review the grant of summary judgment de novo under the same standard as the trial court. Perini Corp. v. Perini Construction, Inc., 915 F.2d 121, 123 (4th Cir. 1990). A motion for summary judgment may be granted "only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985). We must view the facts and the inferences drawn therefrom in the light most favorable to the nonmoving party. Ballinger v. North Carolina Agricultural Extension Service, 815 F.2d 1001, 1004 (4th Cir. 1987). A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).
 
 
 13
 The district court's grant of summary judgment rests primarily on its finding that CNB did not have a duty to protect assets mistakenly wired to CNB depositors. We believe the district court erred in refusing to find such a duty. We find that CNB owed Brothers a duty of reasonable care under common law principles, and, taking the facts and inferences in the light most favorable to Brothers, we find the existence of that duty creates genuine issues of material fact regarding whether CNB breached its duty and whether its breach proximately caused the loss to Brothers. We consider in turn issues relating to the existence of a duty, breach of duty, and proximate cause.
 
 A.
 
 14
 The district court attached great weight to the fact that the federal regulation controlling FedWire uses permissive rather than mandatory language in its discussion of reversal requests. In relevant part, Regulation J states:
 
 
 15
 (a)Request for revocation. A Reserve Bank may cease acting on a transfer item or request if it receives from the transferor a request for revocation in time to give the Reserve Bank a reasonable opportunity to comply. If the request is received too late, the Reserve Bank may, on request from the transferor, ask the transferee to return the funds. In an interoffice transaction, the Reserve Bank may ask the transferee's Reserve Bank to ask the transferee to return the funds.
 
 
 16
 (b)Erroneous transfer. In an erroneous or irregular transfer of funds, a Reserve Bank may, on its own initiative or at the request of another Reserve Bank, ask the transferee to return funds previously transferred.
 
 
 17
 12 C.F.R. § 210.35. While this permissive language does not create a duty on the part of CNB to protect Brothers' assets, the drafting agency for Regulation J, the Federal Reserve Board, has stated that, at the time of the wire transfer in the instant case,
 
 
 18
 Regulation J did not provide comprehensive rules for the relationship between banks and their customers that were parties to fund transfers handled by Federal Reserve Banks.
 
 
 19
 55 Fed. Reg. 40,791 (October 5, 1990). Because Regulation J does not spell out the boundaries of a bank's responsibilities to its depositors or transferors, we may look to common law negligence principles to determine whether CNB owed such a duty to Brothers.[2]
 
 
 20
 Since Brothers brought this diversity action in the United States District Court for the Southern District of West Virginia, the substantive law of West Virginia is controlling. Erie R. Co. v. Tompkins, 304 U.S. 64 (1938). Under West Virginia law, negligence must be proved by the existence of a duty owed to plaintiff by defendant, a breach of that duty, and an injury proximately resulting from that breach. Puffer v. Hub Cigar Store, Inc., 84 S.E.2d 145, 152 (W. Va. 1954). Where a course of conduct is not proscribed by law, foreseeability of injury to one to whom a duty is owed is the "essence" of negligence. Id. at 153. The threshold question of whether and in what form any legal duty exists is a question of law for the court to be decided on the specific facts of the case. See W. Keeton, Prosser & Keeton on Torts, § 37, at 236 (5th ed. 1984).
 
 
 21
 Only one West Virginia case squarely addresses wire transfers and the responsibilities of the parties thereto. In Southern Elec. Supply Co. v. Raleigh County Nat'l Bank, 320 S.E.2d 515 (W. Va. 1984), the West Virginia Supreme Court held that a transferee bank could not transfer wired funds between a depositor's accounts to facilitate the use of the wired funds as a setoff for a debt owed by the depositor to the bank. The court found that "[w]hen a wire transfer comes to a bank, it is obligated by the transmission to credit the designated account," and the bank may not alter the deposit unilaterally. Id. at 519-20.
 
 
 22
 In rejecting Brothers' argument that state law creates a duty of care in the instant case, both CNB and the district court rely on Southern Electric, but Southern Electric does not preclude a finding that a beneficiary bank owes a duty to a bank that initiates a wire transfer or to the initiator of the transfer. Even if the beneficiary bank is barred from unilaterally altering a deposit or wire transfer, we can and do find that the bank must exercise reasonable care in processing the wire transfer and in identifying possible problems therewith.
 
 
 23
 At least one court has found that such a duty exists. In Securities Fund Services, Inc. v. American Nat'l Bank and Trust Co., 542 F. Supp. 323 (N.D. Ill. 1982), the court applied principles of agency and negligence to find that a beneficiary bank owed a duty to initiator banks and initiators to reasonably process wire transfers. The court discerned the duty from two elements: the relationship between the initiator, the initiator bank, and the beneficiary bank and the fact that the beneficiary bank could reasonably foresee that a misappropriation of funds would result where there was a discrepancy between the name on the wire transfer instructions and the name on the account into which the wire was deposited. In Securities Fund, the court held that the beneficiary bank could be held liable for negligently contributing to the resulting misappropriation. Id. at 327.[3]
 
 
 24
 The pivotal factors in Securities Fund are also present in the case at bar. CNB, Star Bank, and Brothers have a relationship as parties to a FedWire transaction. Star Bank and Brothers could reasonably expect that, as a receiving bank for wire transfers, CNB would exercise reasonable care in processing transfer requests and reversal requests. In addition, in accordance with its relationship to Star Bank and Brothers, CNB could reasonably foresee that, under the circumstances, a loss to Brothers may result from (1) depositing the funds from the third transfer in Russell's account without consulting Star Bank, (2) neglecting to notify Star Bank that the funds had been withdrawn, and (3) failing to notify Star Bank or Brothers regarding Russell's stated intention to return the money.
 
 B.
 
 25
 CNB's knowledge of the potential difficulties with the wire transfer not only establishes foreseeability for purposes of finding a duty but also creates a sufficient evidentiary basis for denying CNB's motion for summary judgment on the breach claim. First, CNB's failure to monitor the funds from the third transfer, when Tawney recognized that the third wire transfer was similar to the two previous mistaken transfers, could lead a reasonable jury to find a breach of duty. Second, CNB's failure to notify Brothers or Star Bank that Russell had withdrawn the funds may constitute a breach of duty. Finally, CNB's failure to notify Brothers or Star Bank that a CNB employee communicated with Russell and learned that Russell intended to return the money may have constituted a breach. Each of these questions on the breach issue is a genuine issue of material fact requiring resolution at trial.
 
 C.
 
 26
 We also believe the forecasted evidence presented by Brothers on proximate cause is sufficient to withstand CNB's motion for summary judgment.
 
 
 27
 The district court found that it was Brothers' inaction, rather than CNB's transgressions, that proximately caused the loss of funds. The district court seemed to be applying a rule akin to the last clear chance doctrine: since Brothers failed to take action during the 21 days when the funds were still in the possession of CNB (in a securities account), CNB's earlier failures to exercise reasonable care are not actionable under a negligence theory. However, the West Virginia courts, in adopting the comparative negligence system, have abandoned the last clear chance doctrine. Ratlief v. Yokum, 280 S.E.2d 584, 589 (W. Va. 1981). While Brothers must prove CNB's actions proximately caused the injury, it need not show that CNB's actions were the last or only causes thereof. We believe a reasonable jury could find that CNB's failure to monitor the funds in Russell's account and its failure to notify Star Bank or Brothers about activity on the account proximately caused Brothers' loss of all but $10,000 of the funds it mistakenly wired to Russell.
 
 III.
 
 28
 For the foregoing reasons, we reverse the district court's summary judgment order and remand for trial.
 
 REVERSED AND REMANDED
 
 
 [1]
 Brothers sued Russell in the same action. Prior to its ruling in the instant case, the district court granted summary judgment for Brothers against Russell. That ruling is not appealed here
 
 
 [2]
 At least one court has held that Regulation J defines the limits of the duty owed by the beneficiary bank to the wire initiator bank and the initiator himself. Shawmut Worcester County Bank v. First American Bank & Trust, 731 F. Supp. 57 (D. Mass. 1990). In Shawmut, the court held that the beneficiary bank is the agent for its customer accounts not for the wire initiator bank or the initiator. The court found that, even if there is an agency relationship between the beneficiary's bank and the initiator's bank, it ends at the time beneficiary bank "finally" pays beneficiary. Once paid, the beneficiary bank is under no obligation to reverse the wire. Id. at 60-61
 
 
 [3]
 The court in Securities Fund drew additional support from the Uniform Commercial Code. The court found a wire transfer initiator (Brothers in the instant case) was a customer of the beneficiary bank (CNB in the instant case) under § 4-104(e) of the U.C.C., which defines "customer" as "any person having an account with a bank or for whom a bank has agreed to collect items and includes a bank carrying an account with another bank."
 In addition, the official comment to U.C.C. § 4-203, dealing with the effect of instructions given to a collecting bank by the transferor, states that the collecting bank is liable for failure to exercise good faith or ordinary care. The Securities Fund court found that the beneficiary bank (CNB) was a collecting bank for the initiator bank (Star Bank), which in turn acted as the custodial agent for the funds disbursed by the wire initiator (Brothers). Therefore, Brothers can be seen as a customer of CNB, and CNB, under agency principles, owed Brothers a duty to use due care in handling the wire transfer.