**UNITED STATES of America**

v.

**BCCI HOLDINGS (LUXEMBOURG), S.A., Bank of Credit and Commerce International, S.A., Bank of Credit and Commerce International (Overseas) Limited, and International Credit and Investment Company (Overseas) Limited, Defendants.**

**Crim. Action No. 91–0655 (JHG).**

United States District Court, District of Columbia.

Aug. 26, 1997.

---

Stefan D. Cassella, Michele L. Crawford, U.S. Dept. of Justice, Washington, DC, for the Government.

Curtis A. Ward, Curtis A. Ward & Associates, Washington, DC, for Claimants.

### *In re* **Third Round Petition of the Bank of Jamaica**

### MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

Presently pending is the United States' Motion to Dismiss ("Motion to Dismiss") the Bank of Jamaica's Petition for Adjudication of its Interest in Certain Assets Subject to Forfeiture Order, which was filed pursuant to 18 U.S.C. § 1963(*l*) ("L–Claim"). The government has moved to dismiss the L-claim due to lack of standing and for failure to state a claim. For the reasons expressed below, the Motion to Dismiss will be denied.

### BACKGROUND

The facts surrounding BCCI's collapse are well known in the financial and legal communities, but certain facts bear repeating to set the stage for resolving the instant motion to dismiss the Bank of Jamaica's L–Claim.[1] In early 1991, the Bank of England received troubling information about BCCI's financial condition and integrity. In response, it commissioned a special audit, which "disclosed

---

1. "BCCI," as used herein, refers collectively to BCCI Holdings (Luxembourg) S.A., its two operating subsidiaries, Bank of Credit and Commerce International, S.A., and Bank of Credit and Commerce International (Overseas) Limited, and International Credit and Investment Company (Overseas) Limited, an entity previously found to be the alter ego of the other BCCI entities.

evidence of a complex and massive fraud at BCCI, including substantial loan and treasury account losses, misappropriation of funds, unrecorded deposits, the creation and manipulation of fictitious accounts to conceal bank losses, and concealment from regulatory authorities of BCCI's mismanagement and true financial position." Corrigan, Mattingly & Taylor, *The Federal Reserve's Views on BCCI*, 26 Int'l Law. 963, 970–71 (1992) (based on testimony before the Committee on Banking, Finance and Urban Affairs of the United States House of Representatives on September 3, 1991).

The results of the audit were shared with regulators in other countries, and, on July 5, 1991, banking regulators in the United Kingdom, Luxembourg and the United States, froze assets owned or controlled by BCCI. In New York, the Superintendent of Banks seized BCCI's assets at various New York banks, including those at First American Bank of New York ("FABNY"). By July 6th, eighteen countries had shut down BCCI's operations in their jurisdictions, and, as of July 29, 1991, forty-four countries had closed down BCCI branches.

On November 15, 1991, a three-count Indictment, which included charges of conspiracy, wire fraud and racketeering against BCCI, was filed in this Court. On January 24, 1992, this Court, following findings of fact and conclusions of law with supporting reasons made in open court, accepted the pleas of guilty of the four corporate defendants, collectively known as BCCI, and the Plea Agreement between them and the United States of America. *See* Transcript of Guilty Plea Proceedings at 7 (Jan. 24, 1992). In accordance with 18 U.S.C. § 1963, this Court then entered an Order of Forfeiture.

Under paragraph 9 of the Plea Agreement and pursuant to the Order of Forfeiture, BCCI forfeited all of its property interests in the United States. Pursuant to paragraph 1(e) of the Forfeiture Order, the corporate defendants forfeited to the United States their ownership interests in all property located in the United States, including, without limitation, real property and all tangible and intangible personal property, however held, whether subsequently identified, determined

or discovered in the course of the ongoing liquidation proceedings described therein or otherwise identified, determined, or discovered in any manner at any time (excluding property brought into the United States by or on behalf of Court–Appointed Fiduciaries of BCCI in the course of the management or disbursement of the liquidation estates).

Attached to the First Order of Forfeiture was a listing of BCCI accounts, with corresponding numbers, names, and approximate balances, which the United States Marshals Service was directed to seize forthwith. Because the government was unable to verify certain information concerning additional forfeitable accounts at the time the Order of Forfeiture was entered, the Court issued a First Supplemental Order on January 31, 1992, which directed immediate seizure of the specific assets listed therein. The Court later amended the Order of Forfeiture to include additional assets, including property set forth in Second and Third Supplemental Lists of Forfeited Property. *See* Order of Forfeiture of July 29, 1992 (Second Order of Forfeiture); Order of Forfeiture of August 19, 1993 (Third Order of Forfeiture). Attached to the Third Order of Forfeiture, which is relevant to the L–Claim presently before the Court, was the Third Supplemental List of Forfeited Property aggregating $101,302,465.54.

The Plea Agreement also established the Worldwide Victims Fund and the U.S. Fund. Under the terms of the Plea Agreement, forfeited assets were to be disbursed in equal amounts to the Worldwide Victims Fund and the U.S. Fund. *See* Plea Agreement ¶ 11(c). The broad purpose of the Worldwide Victims Fund, operated by the Court–Appointed Fiduciaries, is to distribute funds "only to innocent depositors, creditors and other victims of BCCI whose claims are not derived directly or indirectly through violations of United States or other laws concerning narcotics, terrorism, money laundering, crimes of violence, or other acts generally recognized as felonies or similar crimes under the law of countries subscribing to recognized norms of international justice." *Id.* ¶ 14.

The purpose of the U.S. Fund is more specific, but no less compensatory. In addi-

tion to allowing for reimbursement of the costs of investigation and prosecution of BCCI, bank insurance and other matters, the U.S. Fund is also available to provide "restitution to victims of BCCI, which may include remission to the Court Appointed Fiduciaries in accordance with 18 U.S.C. § 1963(g) for the purpose of facilitating an increase in assets available for distribution by the Court–Appointed Fiduciaries to innocent worldwide victims of BCCI, and which may include claims related to the failure of CenTrust, if any." *Id.* ¶ 12(f). As a result of BCCI's guilty plea and the subsequent criminal forfeiture proceedings, by July 1996, the United States had "recovered nearly $800 million, virtually all of which has been, or will be, distributed to the victims of the fraud." Testimony of Stefan Cassella before the Judiciary Committee of the House of Representatives (July 22, 1996), 1996 WL 410099; *5 (F.D.C.H.).[2]

In compliance with 18 U.S.C. § 1963(*l*)(1) and to inform third parties of their potential rights to seek recovery of assets declared forfeited in the Third Order of Forfeiture, the United States published notice of the Order of Forfeiture, as amended, during the period September 3, 1993, and September 27, 1993 in eleven major newspapers including the *Wall Street Journal,* the *New York Times,* the *Chicago Tribune,* the *Los Angeles Daily Journal,* the *Washington Post,* and the *International Herald Tribune. See* United States' Notice to the Court (filed Sept. 21, 1993). In addition, personal notice was sent to over 523 persons and entities. *Id.* at Ex. 2, at 11. In response, the Bank of Jamaica timely filed the instant petition.

Through its L–Claim, the Bank of Jamaica seeks to recover US$159,873.37 from BCCI (Overseas) Kingston branch's account # 20492003 at FABNY.[3] The Bank of Jamaica's claim arises from two separate wire

transfers made at the request of originator T. Geddes Grant (Jamaica) Ltd. ("TGG") for payment to the accounts of four beneficiaries: business associates in Canada, the United Kingdom, the United States and the Netherlands. L–Claim ¶¶ 2 & 4. As the originator's bank, the Bank of Jamaica issued the first payment order on July 4, 1991, when it instructed the Bank of Nova Scotia ("BNS") to transfer $145,918.40 to BCCI (Overseas) Kingston branch's account # 20492003 at FABNY, for value on July 9, 1991. Id. ¶ 4. On July 5, 1991, a second payment order was issued, instructing BNS to transfer an additional $13,954.97 to the same account at FABNY for value on July 9, 1991. On the execution date of July 9, 1991, after banking authorities had intervened freezing the assets of BCCI, including those at FABNY, intermediary bank BNS issued a payment order transferring a credit in the amount of US$159,873.37.

Unknown to both BNS and the Bank of Jamaica was the fact that, on June 26, 1991, BCCI (Overseas) Kingston branch had instructed FABNY to close its account # 20492003, effective on June 27, 1991, and transfer the balance in that account to a new account, # 44103572, at BCC London. On July 9, 1991, "FABNY apparently opened a new account # 550547877 on BCCI (Overseas) Kingston's behalf and deposited the transferred funds therein." Motion to Dismiss at 26.

The United States has moved to dismiss the Bank of Jamaica's petition on the grounds that it is a general creditor of BCCI and lacks standing in this proceeding. The Bank of Jamaica did not file a brief in opposition and did not request oral argument to contest the government's motion.

## DISCUSSION

BCCI's assets were forfeited pursuant to 18 U.S.C. § 1963, which sets forth an orderly

---

**2.** In 1995, over $225 million was disbursed to the Court Appointed Fiduciaries for the Worldwide Victims Fund. *See* Notice to the Court at I (filed Aug. 13, 1996). On August 1, 1996, the United States disbursed an additional $83,651,-863.24, *id.* at 2, and, on May 22, 1997, Attorney General Janet Reno "determined that the United States would transfer 100 percent of its share of the forfeited funds to the Worldwide Victims Fund so that the funds might be distributed to all

BCCI victims equally on a pro rata basis." Notice to the Court at 2 (filed July 11, 1997).

**3.** Although the Third Order of Forfeiture did not include an account with this number, the United States has not contested that the funds sought by the Bank of Jamaica were seized in a different account held by FABNY.

procedure by which third parties seeking to recover interests in forfeited property may obtain judicial resolution of their claims.[4] It permits any person, other than the defendant, claiming a legal interest in forfeited property to petition the Court for a hearing to adjudicate the validity of that interest. 18 U.S.C. § 1963(*l*)(2).[5] Section 1963(*l*)(6) sets forth the substantive elements that a third party must establish to obtain amendment of an order of forfeiture:

> If, after the hearing, the court determines that the petitioner has established by a preponderance of the evidence that—
>
>> (A) the petitioner has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section; or
>>
>> (B) the petitioner is a bona fide purchaser for value of the right, title, or interest in the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section;
>
> the court shall amend the order of forfeiture in accordance with its determination.

18 U.S.C. § 1963(*l*)(6).

■ A petitioner must first establish standing. Only by establishing standing and alleging the requisite elements of either § 1963(*l*)(6)(A) or § 1963(*l*)(6)(B) may a party obtain judicial relief from an order of forfeiture. *See United States v. BCCI Holdings (Luxembourg), S.A., et al. (In re Petition of American Express Bank)*, 941 F.Supp. 180, 184 (D.D.C.1996); *United States v. BCCl Holdings (Luxembourg), S.A., et al. (In re Petition of BCCI(O) Foreign Branches)*, 833 F.Supp. 32, 36 (D.D.C.1993), *aff'd*, 46 F.3d 1185, 1188 (D.C.Cir.), *cert. denied sub norm. Chawla v. United States*, 515 U.S. 1160, 115 S.Ct. 2613, 132 L.Ed.2d 856 (1995); *United States v. BCCI Holdings (Luxembourg). S.A., et al. (In re Petition of Chawla)*, 833 F.Supp. 9, 13 (D.D.C.1993); *aff'd*, 46 F.3d 1185, 1188 (D.C.Cir.), *cert. denied sub norm. Chawla v. United States*, 515 U.S. 1160, 115 S.Ct. 2613, 132 L.Ed.2d 856 (1995); *see also United States v. Schwimmer*, 968 F.2d 1570, 1584 (2nd Cir. 1992); *United States v. Lavin*, 942 F.2d 177, 187(3rd Cir.1991). If a third party fails to allege in its petition all elements necessary for recovery, including those relating to standing, the court may dismiss the petition without providing a hearing. *See In re Petition of Chawla*, 833 F.Supp. at 13; *see also* S.Rep. No. 225, 98th Cong., 1st Sess. 191, 208 n. 46 (Sept. 12, 1983); *United States v. Campos*, 859 F.2d 1233, 1240 (6th Cir.1988); *United States v. Mageean*, 649 F.Supp. 820, 825 (D.Nev.1986), *affd. without opinion*, 822 F.2d 62 (9th Cir.1987).

A motion to dismiss under Fed.R.Civ.P. 12(b)(6) may be granted if it appears that the petitioner can prove no facts that would enti-

---

**4.** 18 U.S.C. § 1963(a) provides, in relevant part: Whoever violates any provision of section 1962 of this chapter shall ... forfeit to the United States, irrespective of any provision of State law—

> (1) any interest the person has acquired or maintained in violation of section 1962;
>
> (2) any—
>
>> (A) interest in;
>>
>> (B) security of,
>>
>> (C) claim against; or
>>
>> (D) property or contractual right of any kind affording a source of influence over;
>
> any enterprise which the person has established, operated, controlled, conducted, or participated in the conduct of, in violation of section 1962; and
>
> (3) any property constituting, or derived from, any proceeds which the person has obtained directly or indirectly, from racketeering activity or unlawful debt collection in violation of section 1962.

The court, in imposing sentence on such person shall order ... that the person forfeit to the United States all property described in this subsection.

**5.** This provision provides:

Any person other than the defendant, asserting a legal interest in property which has been ordered forfeited to the United States pursuant to this section may, within thirty days of the final publication of notice or his receipt of notice under paragraph (1), whichever is earlier, petition the court for a hearing to adjudicate the validity of his alleged interest in the property. The hearing shall be held before the court alone, without a jury.

tle it to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Kenneda v. United States,* 880 F.2d 1439, 1442 (D.C.Cir.1989). The Court assumes true well-pleaded facts and construes the petition liberally, granting a petitioner the benefit of any reasonable inferences that can be derived from the facts alleged. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). The Court is not required, however, to accept inferences unsupported by the facts alleged or legal conclusions that are cast as factual allegations. *Kowal v. MCI Communications,* 16 F.3d 1271, 1275 (D.C.Cir.1994).

■ Section 1963(*l*)(2) requires a party to assert "a legal interest in property forfeited to the United States" to have standing. This requirement is imposed to further the purpose of an L–Claim proceeding, which, while ancillary to the underlying criminal case, is intended to ensure that property forfeited to the United States was that of the defendant; it does not attempt to divide the defendant's estate among competing claimants. *See. United States v. BCCI Holdings (Luxembourg), S.A. (In re Petitions of General Creditors),* 814 F.Supp. 106, 110 (D.D.C. 1993). This latter task is properly performed at a liquidation proceeding, where all parties without a "legal interest" in forfeited property can recover on a *pro rata* basis with the many other claimants to the debtor's estate. *Id.* at 111; *see Downriver Community Fed. Credit Union v. Penn Square Bank,* 879 F.2d 754 (10th Cir.1989), *cert. denied,* 493 U.S. 1070, 110 S.Ct. 1112, 107 L.Ed.2d 1019 (1990); *First Empire Bank–New York v. F.D.I.C.,* 572 F.2d 1361 (9th Cir.1978), *cert. denied,* 439 U.S. 919, 99 S.Ct. 293, 58 L.Ed.2d 265 (1978).

■ The critical inquiry in an L–Claim proceeding is, therefore, ownership of the disputed funds. As recognized by this Court and most, if not all, other courts addressing the issue, an unsecured creditor does not possess an interest in any specific asset of a debtor and merely has a general interest in the debtor's entire estate. *See In re Petition of Chawla,* 46 F.3d at 1191; *see also Schwimmer,* 968 F.2d at 1581; *Campos,* 859 F.2d at 1240; *United States v. Reckmeyer,* 836 F.2d 200, 206 & n. 3 (4th Cir.1987); *Mageean,* 649 F.Supp. at 828. Because a general creditor is unable to assert an interest in a specific asset, it cannot assert a legal right, title, or interest "in property which has been ordered forfeited" as required by § 1963(*l*)(2), at least in situations where, like here, a defendant's entire estate is not subject to forfeiture. *In re Petition of Chawla,* 46 F.3d at 1191; *see Reckmeyer,* 836 F.2d at 206 n. 3 ("It is the dilemma of linking their interest to a specific asset rather than the problem of asserting a legal interest in the debtor's estate that frustrates general creditors who attempt to contest … forfeitures."). Accordingly, absent a showing of an interest in a specific asset, the petitioners would lack standing to assert a claim in these L-proceedings.

The United States argues that the Bank of Jamaica is a general creditor: "when FABNY accepted the payment order from BNS transferring funds from BOJ to the BCCI (Overseas) Kingston account, title to those funds vested in the BCCI (Overseas) Kingston account, and BCCI (Overseas) Kingston owned a credit which it held as a general asset. When BCCI (Overseas) Kingston failed to complete the transfer of the funds to TGG's business associates, the intended beneficiaries of the transfer, BOJ retained a general, unsecured claim against BCCI (Overseas)." *Id.* at 13. "Although BOJ may have a cause of action against FABNY, BOJ does not have an ownership interest in the transferred funds" sufficient to establish standing. *Id.* at 26–27.

Assuming the petitioner's facts to be true, in this transaction the Bank of Jamaica was the originator's bank, N.Y.U.C.C. § 4–A–104(4), and BCCI (Overseas), as the bank that would pay beneficiaries, acted as the beneficiary's bank. *Id.* § 4–A–103(1)(C). BNS and FABNY, as correspondents, were intermediary banks under Article 4–A–104(2). *See id.* § 4–A–103(1)(d) (defining receiving bank). A sender is the entity giving an instruction to a receiving bank. *Id* § 4–A–103(1)(e); *see Fry, Basic Concepts in Article 4A: Scope and Definitions,* 45 Bus.Law. 1401, 1412 (1990).

Acceptance within the meaning of Article 4–A of the New York Uniform Commercial Code, which provides the rule of decision for this funds transfer, *see* N.Y.U.C.C. § 4–A–101 Official Comment, is the key to resolving the instant dispute, because title to funds in a wire transfer passes to a receiving bank upon acceptance of a payment order.[6] *See, e.g., In re Petitions of General Creditors,* 814 F.Supp. at 109; *Shawmut Worcester County Bank v. First American Bank & Trust,* 731 F.Supp. 57, 60 (D.Mass.1990). Pursuant to Article 4–A, a funds transfer is completed when the bank of the beneficiary of the funds transfer accepts the payment order. N.Y.U.C.C. § 4–A–104(1). Such acceptance occurs, subject to certain conditions, at the earliest of: (1) when the bank pays the beneficiary or notifies the beneficiary of receipt of the order or that the account has been credited; (2) when the bank receives payment of the entire amount of the transfer; or (3) the beginning of the bank's next funds-transfer business day. N.Y.U.C.C. § 4–A–209(2). Because an accepted transfer cannot be revoked without the consent of the beneficiary, *Middle East Banking Co. v. State Street Bank Int'l,* 821 F.2d 897, 901–02 (2d Cir.1987), and the beneficiary's bank incurs an obligation to the beneficiary upon acceptance of the funds, *see* N.Y.U.C.C. § 4–A–404, the ownership interest in those funds must pass from the originator upon completion of the funds transfer. *See Shawmut Worcester County Bank,* 731 F.Supp. at 60.

Under Article 4–A, and directly applicable to the facts alleged in this case, BCCI (Overseas) Kingston branch would have accepted FABNY's payment order when BCCI received payment of the entire amount through FABNY's credit pursuant to paragraph (a) or (b) of Article 4–A–403(1).[7] N.Y.U.C.C. § 4–A–209(2)(b); *see* Baxter & Bhala, *Proper and Improper Execution of Payment Orders,* 45 Bus.Law. 1447, 1452 (1990) ("acceptance occurs ... at the time the bank receives payment"); Nelson, *Settlement Obligations and Bank Insolvency,* 45 Bus. Law. 1473, 1476 (1990) ("When payment is made on a funds transfer system, the payment is made when that settlement is complete.") (citing U.C.C. § 4A–403(b)); Ballen & Diana, *Duties of the Beneficiary's Bank,* 45 Bus.Law. 1467, 1468 (1990) ("payment by the sender [bank] to the beneficiary's bank occurs ... if the sender credited an account of the beneficiary's bank with the sender"). Thus, BCCI (Overseas) Kingston would have acquired title to the funds at issue upon receipt of FABNY's credit. N.Y.U.C.C. §§ 209(2)(b); 403(1)(b).

Examined in this light, the Bank of Jamaica's L–Claim will survive the motion to dismiss, because the petitioner may be able to prove facts that would entitle it to relief. The assumption underlying the United States' motion, which the Bank of Jamaica challenges, is that FABNY's credit to an account opened by FABNY (on BCCI's behalf) after the regulatory intervention on July 5, 1991, was effective to convey title to BCCI. In response, the Bank of Jamaica argues that when FABNY received BNS's payment order on July 9th, BCCI (Overseas) Kingston branch could not, as a matter of law, have accepted the payment order within the meaning of Article 4–A because BCCI (Overseas) Kingston branch had closed its account with FABNY, *See* N.Y.U.C.C. § 4–A–209(3).[8] Consequently, title would not have passed from FABNY to BCCI (Over-

---

6. A payment order is defined in Art. 4–A–103(1)(a) as

    an instruction of a sender to a receiving bank, transmitted orally, electronically, or in writing to pay, or to cause another bank to pay, a fixed or determinable amount of money to a beneficiary if
    (i) the instruction does not state a condition to payment to the beneficiary other than time of payment,
    (ii) the receiving bank is to be reimbursed by debiting an account of, or otherwise receiving payment from the sender, and

    (iii) the instruction is transmitted by the sender directly to the receiving bank or to an agency, funds transfer system, or communication system for transmittal to the receiving bank.

7. There are other ways for a beneficiary bank to accept a payment order, but this appears to be method relevant to the instant L–Claim.

8. This provision provides, in relevant part, "acceptance does not occur ... if the beneficiary of the payment order does not have an account with the receiving bank."

seas) Kingston branch, nor would it have passed from BNS to FABNY, since an intermediary bank accepts a payment order only upon execution. *Id.* § 4–A–209(1). If title never passed to BCCI before it became insolvent, then the Bank of Jamaica would have standing in this proceeding, because it has identified a right, title or interest in a specific asset that, at least on these facts, is not the property of the defendants and to which it may have a vested or superior interest.

 Accordingly, the Bank of Jamaica has stated a cognizable claim on the merits sufficient to warrant denial of the Motion to Dismiss.[9]

## CONCLUSION

For the reasons stated above, it is hereby

**ORDERED** that the government's Motion to Dismiss the Bank of Jamaica's L–Claim is **DENIED;** and it is

**FURTHER ORDERED** that the government shall file its Answer on before September 15, 1997; and the parties shall meet and confer, filing a Joint Statement in accordance with Local Rule 206 on or before **October 6, 1997.** Upon reviewing the Joint Statement, the Court will issue an appropriate scheduling order.

IT IS SO ORDERED.

---

9. The Court does not reach the petitioner's alternative argument that the regulatory intervention resulted in the suspension of payments (and consequent rejection of unaccepted payment orders) on and after July 5, 1991. *See* N.Y.U. C.C. § 4–A–210(c) ("If a receiving bank suspends all payments, all unaccepted payment orders issued to it are deemed rejected at the time the bank suspends payments.") (emphasis added). However, this section appears to be inapplicable since the relevant payment orders were issued *after* the freeze was imposed.