**UNITED STATES of America,**

v.

**BCCI HOLDINGS (LUXEMBOURG), S.A., Bank of Credit and Commerce International, S.A., Bank of Credit and Commerce International (Overseas) Limited, and International Credit and Investment Company (Overseas) Limited, Defendants.**

Crim. Action No. 91–0655 (JHG).

United States District Court, District of Columbia.

Feb. 13, 1997.

Stefan D. Cassella, Daniel C. Stark, Ruth A. Harvey, Bea L. Witzleben, Lloyd H. Randolph, Trial Attorneys, U.S. Dept. of Justice, for Government.

Louis T. Urbanczyk, Miller, Hamilton, Snider, Odom & Bridgeman, (L. Adam Weiner, Asst. Vice President and Counsel, The Pacific Bank, N.A., of counsel), for The Pacific Bank.

### MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

Presently before the Court is the United States' Motion to Dismiss ("Motion to Dismiss") the Third Party Petition For Hearing to Adjudicate Property Interest of The Pacific Bank pursuant to 18 U.S.C. § 1963(*l*) (1994) ("L–Claim"). For the reasons expressed below, the motion will be granted and the L–Claim will be dismissed.

### Background

The facts regarding the collapse of Bank of Credit and Commercial International ("BCCI")[1] are well known in the financial and legal communities and only a brief background discussion is provided herein. In early 1991, the Bank of England received troubling information about BCCI's financial condition and integrity. In response, it commissioned a special audit, which "disclosed evidence of a complex and massive fraud at BCCI, including substantial loan and treasury account losses, misappropriation of funds, unrecorded deposits, the creation and manipulation of fictitious accounts to conceal bank losses, and concealment from regulatory authorities of BCCI's mismanagement and true financial position." Corrigan, Mattingly & Taylor, *The Federal Reserve's Views on BCCI*, 26 Int'l Law. 963, 970–71 (1992) (based on testimony before the Committee on Banking, Finance and Urban Affairs of the United States House of Representatives on September 3, 1991).

The results of the audit were shared with banking regulators in other countries. Based upon that audit and independent domestic investigations, on July 5, 1991, regulators in the United Kingdom, Luxembourg and the United States froze assets owned or controlled by BCCI. In New York, the Superintendent of Banks took possession of BCCI's assets at various New York banks, prohibiting transfers from those accounts.[2]

---

1. "BCCI," as used herein, refers collectively to BCCI Holdings (Luxembourg) S.A., its two operating subsidiaries, Bank of Credit and Commerce International, S.A., and Bank of Credit and Commerce International (Overseas) Limited, and International Credit and Investment Company (Overseas) Limited, an entity previously found to be the alter ego of the other BCCI entities.

2. The order providing notice of the seizure stated, in relevant part:

 Please take notice, that, pursuant to the provisions of Section 606 of the Banking Law of the State of New York, I, Vincent P. Conlon, Acting Superintendent of the Banks of the State of New York, have this day taken possession of the property and business in this State of Bank of Credit and Commerce International S.A. and give notice of such fact to you, as provided in Section 615 of said law, that you may have no lien or charge for any payment, advance or clearance thereafter made against any of the assets of said bank for liability thereafter incurred.

On November 15, 1991, a three-count Indictment charging 'BCCI with conspiracy, wire fraud and racketeering was filed in this Court. On January 24, 1992, following findings of fact and conclusions of law with supporting reasons made in open court, this Court accepted the pleas of guilty of the four corporate defendants, collectively known as BCCI, and the Plea Agreement between them and the United States of America. *See* Transcript of Guilty Plea Proceedings, at 7 (Jan. 24, 1992). In accordance with 18 U.S.C. § 1963, this Court then entered an Order of Forfeiture.

Under paragraph 9 of the Plea Agreement, BCCI forfeited all of its property interests in the United States. Pursuant to paragraph 1(e) of the Forfeiture Order, this included BCCI's ownership interests in all real property, tangible and intangible personal property, however held, whether subsequently identified, determined or discovered in the course of the ongoing liquidation proceedings described therein or otherwise identified, determined, or discovered in any manner at any time (excluding property brought into the United States by or on behalf of the Court–Appointed Fiduciaries of BCCI in the course of the management or disbursement of the liquidation estates). Attached to the Order of Forfeiture, as amended, was a list of BCCI accounts, with corresponding numbers, names, and approximate balances, which the United States Marshals Service was directed to seize forthwith.

The Plea Agreement also established the Worldwide Victims Fund and the U.S. Fund. Under the terms of the Plea Agreement, forfeited assets were to be disbursed in equal amounts to the Worldwide Victims Fund and the U.S. Fund. *See* Plea Agreement ¶ 11(c). The broad purpose of the Worldwide Victims Fund, operated by the Court–Appointed Fiduciaries, is to distribute funds "only to innocent depositors, creditors and other victims of BCCI whose claims are not derived directly or indirectly through violations of United States or other laws concerning narcotics, terrorism, money laundering, crimes of violence, or other acts generally recognized as felonies or similar crimes under the law of countries subscribing to recognized norms of international justice." *Id.* ¶ 14.

The purpose of the U.S. Fund is more specific. In addition to allowing for reimbursement of the costs of investigation and prosecution of BCCI, bank insurance and other matters, the U.S. Fund is also available to provide "restitution to victims of BCCI, which may include remission to the Court Appointed Fiduciaries in accordance with 18 U.S.C. § 1963(g) for the purpose of facilitating an increase in assets available for distribution by the Court–Appointed Fiduciaries to innocent worldwide victims of BCCI." *Id.* ¶ 12(f). As a result of BCCI's guilty plea and the subsequent criminal forfeiture proceedings, the United States has "recovered nearly $800 million, virtually all of which has been, or will be, distributed to the victims of the fraud." Testimony of Stefan Cassella before the Judiciary Committee of the House of Representatives (July 22, 1996), 1996 WL 410099, *5 (F.D.C.H.).[3]

Among the assets seized pursuant to the Order of Forfeiture of January 24, 1992, was account # 07012001 held by Security Pacific International Bank ("SPIB") on behalf of BCCI (Overseas) Cayman ("BCCI Cayman"). On the date it was forfeited to the United States, the account balance totaled $4,124,-192.31 and included the $305,198.99 at issue in the instant L–Claim (hereinafter referred to as "forfeited funds").

The following facts are alleged in the L–Claim. The Pacific Bank maintains numerous fiduciary accounts on behalf of Cushman & Wakefield ("C & W"), a property management company. L–Claim ¶ 1. Among those accounts was one labeled "C & W, as Agent for Minos Management Company, number 1150–708510." *Id.* ¶ 2. Prior to November 13, 1991, C & W directed The Pacific Bank to transfer funds from account number 1150–708510 to SPIB in favor of BCCI Cayman, account number 07012001, for further credit to Minos Management, account number 02000770. *Id.* ¶ 3. On or about November

---

**3.** In 1995, over $225 million was disbursed to the Court Appointed Fiduciaries for the Worldwide Victims Fund. *See* Notice to the Court, at 1 (filed Aug. 13, 1996). On August 1, 1996, the United States disbursed an additional $83,651,-863.24. *Id.* at 2.

13, 1991, C & W modified its instructions to provide that all wire transfers were to be sent to Chase Manhattan Bank instead of SPIB for credit to BCCI Cayman. *Id.* ¶ 4.

On two occasions thereafter bank personnel failed to follow C & W's new instructions. On or about December 27, 1991, the bank transferred by wire $234,650.62 to SPIB "for credit to BCCI's Grand Cayman Division, account number 07012001." *Id.* ¶ 6. And, on or about January 22, 1992, the same error occurred, resulting in a transfer of $70,548.37 to SPIB "for credit to BCCI Cayman account number 07012001." *Id.* ¶ 7.

The beneficiary, Minos Management, never received credit for the funds, totaling $305,198.99, which, pursuant to The Pacific Bank's instructions, as the originator's bank, were deposited into BCCI Cayman's (the beneficiary's bank's) account at SPIB. *Id.* ¶¶ 8–9. On January 24, 1992, the Court entered the First Order of Forfeiture, which included BCCI Cayman account number 07012001 at SPIB. The Pacific Bank contends that on or about February 20, 1992, it became aware that BCCI Cayman account number 07012002, among others at SPIB, had been forfeited to the United States. *Id.* ¶ 9. Thereafter, The Pacific Bank petitioned for an amendment to the Order of Forfeiture, explaining it had repaid C & W for the loss and asserting its interest in the forfeited funds. *Id.* ¶ 10.

The United States has moved to dismiss the L–Claim, arguing that The Pacific Bank lacks standing to assert a claim, because it is a general unsecured creditor of BCCI. On the merits, the government contends that the petitioner has failed to state a claim upon which relief can be granted because The Pacific Bank lacks a legal interest in a specific asset as required by 18 U.S.C. § 1963(*l*)(6)(A), and it is not a bona fide purchaser for value under 18 U.S.C. § 1963(*l*)(6)(B).

## Discussion

Title 18, United States Code, Section 1963 sets forth an orderly procedure by which third parties seeking to recover interests in forfeited property may obtain judicial resolution of their claims. The provision granting standing to parties seeking to amend an order of forfeiture to exclude certain property states:

Any person other than the defendant, asserting a legal interest in property which has been ordered forfeited to the United States pursuant to this section may, within thirty days of the final publication of notice or his receipt of notice under paragraph (1), whichever is earlier, petition the court for a hearing to adjudicate the validity of his alleged interest in the property. The hearing shall be held before the court alone, without a jury.

18 U.S.C. § 1963(*l*)(2).

Section 1963(*l*)(6) sets forth the substantive elements that a third party must establish to obtain amendment of an order of forfeiture. This section provides:

If, after the hearing, the court determines that the petitioner has established by a preponderance of the evidence that—

(A) the petitioner has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section; or

(B) the petitioner is a bona fide purchaser for value of the right, title, or interest in the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section;

the court shall amend the order of forfeiture in accordance with its determination.[4]

4. Title 18 U.S.C. § 1963(*l*)(6) contains exactly the same language as 21 U.S.C. § 853(n)(6), the statute providing for forfeiture in criminal narcotics cases, and it appears that no court has interpreted these two provisions differently. Because the two subsections are identical and because of the relative dearth of case law interpreting and applying Section 1963(*l*), the Court's opinion relies on the reasoning contained in Section 853(n) cases as well as that in Section 1963(*l*) cases.

Only by establishing standing and satisfying the requisite elements of either Subsection 1963($l$)(6)(A) or Subsection 1963($l$)(6)(B) may a party obtain judicial relief from an order of forfeiture. *See United States v. BCCI Holdings (Luxembourg), S.A.*, 46 F.3d 1185, 1188 (D.C.Cir.), *cert. denied sub nom. Chawla v. United States*, —— U.S. ——, 115 S.Ct. 2613, 132 L.Ed.2d 856 (1995); *United States v. Schwimmer*, 968 F.2d 1570, 1584 (2d Cir.1992); *United States v. Lavin*, 942 F.2d 177, 187 (3d Cir.1991).

■ If a third party fails to allege in its petition all elements necessary for recovery, including those relating to standing, the court may dismiss the petition without providing a hearing. *See United States v. Campos*, 859 F.2d 1233, 1240 (6th Cir.1988); *United States v. Mageean*, 649 F.Supp. 820, 825 (D.Nev.1986), *aff'd without opinion*, 822 F.2d 62 (9th Cir.1987); S.Rep. No. 225, 98th Cong., 1st Sess. 191, 208 n. 46 (Sept. 12, 1983), U.S.Code Cong. & Admin.News 1984, p. 3182.

■ In resolving a motion to dismiss, the Court assumes true, as she must, the facts alleged in the L–Claim. A motion to dismiss under Fed.R.Civ.P. 12(b)(6) may be granted if it appears that the petitioner can prove no facts that would entitle it to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Kenneda v. United States*, 880 F.2d 1439, 1442 (D.C.Cir.1989). The Court must construe the complaint liberally, granting a petitioner the benefit of any reasonable inferences that can be derived from the facts alleged. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). The Court is not required, however, to accept inferences unsupported by the facts alleged or legal conclusions that are cast as factual allegations. *Kowal v. MCI Communications*, 16 F.3d 1271, 1275 (D.C.Cir.1994).

### Standing

■ Section § 1963($l$)(2) requires a party to assert "a legal interest in property forfeited to the United States" to have standing. This requirement is imposed not to enrich the United States or otherwise to achieve inequitable results, but to further the pur-

pose of an L-proceeding as ancillary to the underlying criminal case. An L-proceeding seeks merely to ensure that property forfeited to the United States was that of the defendant; it does not attempt to divide the defendant's estate among competing claimants. *See United States v. BCCI Holdings (Luxembourg), S.A.*, 814 F.Supp. 106, 110 (D.D.C.1993). This latter task is properly performed at a liquidation proceeding, where all parties without a "legal interest" in forfeited property can recover on a *pro rata* basis with the many other claimants to the debtor's estate. *Id.* at 111; *see Downriver Community Fed. Credit Union v. Penn Square Bank*, 879 F.2d 754 (10th Cir.1989), *cert. denied*, 493 U.S. 1070, 110 S.Ct. 1112, 107 L.Ed.2d 1019 (1990); *First Empire Bank–New York v. F.D.I.C.*, 572 F.2d 1361 (9th Cir.1978), *cert. denied*, 439 U.S. 919, 99 S.Ct. 293, 58 L.Ed.2d 265 (1978).

■ The critical inquiry in an L-proceeding is, therefore, ownership of the disputed funds. As recognized by this Court and most, if not all, other courts addressing the issue, an unsecured creditor does not possess an interest in any specific asset of a debtor and merely has a general interest in the debtor's entire estate. *See United States v. BCCI Holdings*, 833 F.Supp. 9, 14–15 (D.D.C. 1993), *aff'd*, 46 F.3d 1185, 1191 (1995), *cert. denied sub nom. Chawla v. United States*, —— U.S. ——, 115 S.Ct. 2613, 132 L.Ed.2d 856 (1995); *see also Schwimmer*, 968 F.2d at 1581; *Campos*, 859 F.2d at 1240; *United States v. Reckmeyer*, 836 F.2d 200, 206 & n. 3 (4th Cir.1987); *Mageean*, 649 F.Supp. at 828. Because a general creditor is unable to assert interests in specific assets, they cannot assert a legal right, title, or interest "in property which has been ordered forfeited" as required by § 1963($l$)(2), at least in situations where a defendant's entire estate is not subject to forfeiture. *See Reckmeyer*, 836 F.2d at 206 n. 3 ("It is the dilemma of linking their interest to a specific asset rather than the problem of asserting a legal interest in the debtor's estate that frustrates general creditors who attempt to contest ... forfeitures."). Accordingly, absent a showing of an interest in a specific asset, The Pacific

Bank lacks standing to assert a claim in this L-proceeding.

 Examined in this light, the L–Claim must be dismissed. The underlying transaction involves an electronic transfer of funds that is governed by Article 4A of the Uniform Commercial Code ("U.C.C.").[5] *See* U.C.C. § 4A–101, Official Comment (this article provides a "comprehensive body of law that defines the rights and obligations that arise from wire transfers"). Pursuant to Article 4A, a funds transfer is completed when the beneficiary's bank in an electronic funds transfer accepts a payment order. U.C.C. § 4A–104(a). Acceptance occurs, subject to conditions not relevant here, at the earliest of: (1) when the bank pays the beneficiary or notifies the beneficiary of receipt of the order or that the account has been credited; (2) when the bank receives payment of the entire amount of the transfer; or (3) the beginning of the bank's next funds-transfer business day. U.C.C. § 4A–209(b). Because an accepted transfer cannot be revoked without the consent of the beneficiary, *Middle East Banking Co. v. State Street Bank Int'l,* 821 F.2d 897, 901–02 (2d Cir.1987), and the beneficiary's bank incurs an obligation to the beneficiary upon acceptance of the funds, *see* U.C.C. § 4A–404, the ownership interest in those funds passes from the originator to the beneficiary's bank upon completion of the funds transfer. *See Shawmut Worcester County Bank v. First American Bank & Trust,* 731 F.Supp. 57, 60 (D.Mass.1990) (completion of a wire transfer "extinguished Shawmut's 'ownership interest' in the funds as personal property" prohibiting recovery on a conversion theory).

 Upon completion of a wire transfer, the funds simply become part of the general deposits of the bank, and the transferee becomes a general depositor of the bank. *See*

*United States v. BCCI Holdings (Luxembourg), S.A.,* 814 F.Supp. 106, 109–10 (D.D.C. 1993).[6] At that point, the beneficiary bank acquires an ownership interest in the transferred funds and the bank that transferred the money to the receiving bank (or perhaps the intended beneficiary) acquires a cause of action against the beneficiary bank. Such a cause of action is not a "legal interest" in the forfeited property, but a claim against the estate of the bank. *Id.*

This Court has considered "mistaken" wire transactions before. In 1994, six petitioners sought remission of forfeited funds after each transferred funds into the account of a BCCI branch due to "some mistake, error or inadvertent act, such as ordering money transferred into the wrong account, transferring a sum of money in duplicate or failing to comply with cancellation instructions." *United States v. BCCI Holdings,* No. 91–0655, slip. op. at 3 (D.D.C. Oct. 28, 1994) (*In re* Mistaken Wire Transfer Petitioners). The Mistaken Wire Transfer Petitioners contended that, under New York law, a party who mistakenly receives a payment from another is not entitled to keep the erroneous payment. *See Bank Saderat Iran v. Amin Beydoun, Inc.,* 555 F.Supp. 770, 773 (S.D.N.Y.1983); *Banque Worms v. BankAmerica Int'l,* 77 N.Y.2d 362, 366, 568 N.Y.S.2d 541, 543–44, 570 N.E.2d 189, 191 (1991). Thus, they claimed that BCCI acquired only an obligation to return the disputed funds. *Parsa v. New York,* 64 N.Y.2d 143, 485 N.Y.S.2d 27, 29, 474 N.E.2d 235, 237 (1984). Despite their best efforts, this argument provided them no shelter, because it ignored the fact that pursuant to Article 4A, BCCI, however improperly it might have done so, acquired an ownership interest in the funds once acceptance occurred; the petitioners then became mere claimants to those funds. Because they were unable to assert a claim in a specific asset,

---

5. Article 4A has been adopted in over forty states and was adopted in New York on January 1, 1991. U.C.C. § 4A–102, Official Comment.

6. In its L–Claim, The Pacific Bank did not allege facts suggesting that BCCI Cayman's account was a special account. *See Peoples Westchester Sav. Bank v. F.D.I.C.,* 961 F.2d 327, 330 (2d Cir.1992). In its memorandum in opposition, however, it offered a legal theory that, in effect,

stands for the proposition that *all* wire transfers are conducted through special accounts. To state this argument is to reject it. While the Court assumes true the facts pled, it is under no obligation to accept the petitioner's legal conclusions regarding the nature of the BCCI Cayman account, particularly where those conclusions are unsupported by alleged facts. *See Kowal,* 16 F.3d at 1275.

the Court denied their petitions. As general creditors, the petitioners could assert their claims in the liquidation proceedings or before the Attorney General under 18 U.S.C. § 1963(g).

Like the Mistaken Wire Transfer Petitioners, from the perspective of Article 4, The Pacific Bank is nothing more than a depositor seeking to recover funds as a general or unsecured creditor of BCCI. While The Pacific Bank is differently situated than were the Mistaken Wire Transfer Petitioners, under Article 4, the distinction is one without a difference. Although the funds transfers initiated by the Mistaken Wire Transfer Petitioners occurred prior to the massive worldwide intervention on July 5, 1991, The Pacific Bank's mistaken transactions occurred well after the publicized shutdown of BCCI.[7] Contrary to The Pacific Bank's arguments, however, this factual difference does not matter under the law of electronic funds transfers.[8]

▮▮▮▮ The Pacific Bank's principal argument is premised on a misunderstanding of the scope of 18 U.S.C. § 1963(a) coupled with a misreading of the Order of Forfeiture. While the bank contends that the funds must have a nexus to BCCI's illegal activities in order to be forfeitable, *see* Memorandum in Opposition at 5, 18 U.S.C. § 1963(a)(2)(A) provides for the forfeiture of "any interest in ... any enterprise" which the defendants establish, operate or control, however that interest is acquired. *See, e.g., United States v. Anderson*, 782 F.2d 908, 918 (11th Cir. 1986). The purpose of subsection (a)(2) is to separate the assets from the convicted racketeer, thereby destroying the underlying economic base. *See United States v. Rubin*, 559 F.2d 975, 991–92 (5th Cir.1977), *vacated and remanded on other grounds*, 439 U.S. 810, 99 S.Ct. 67, 58 L.Ed.2d 102 (1978). Subsection (a)(2)(A) is textually distinct from other subsections that do require a nexus to racketeering. *Compare* 18 U.S.C. § 1963(a)(1) ("any interest ... acquired or maintained in violation of section 1962") *and id.* § 1963(a)(3) ("property constituting, or derived from, any proceeds") *with id.* § 1963(a)(2) ("any interest in any enterprise"); *see United States v. Porcelli*, 865 F.2d 1352, 1364–65 (2d Cir.), *cert. denied*, 493 U.S. 810, 110 S.Ct. 53, 107 L.Ed.2d 22 (1989). Under subsection (a)(2), *all* of a RICO defendant's interests in an enterprise, including the enterprise itself, are subject to forfeiture in their entirety, regardless of whether some portion of the enterprise is untainted by racketeering activity. *See United States v. Angiulo*, 897 F.2d 1169, 1211 (1st Cir.), *cert. denied*, 490 U.S. 845, 111 S.Ct. 130, 112 L.Ed.2d 98 (1990); *Porcelli*, 865 F.2d at 1364–65; *United States v. McKeithen*, 822 F.2d 310, 314 (2d Cir.1987); *United States v. Cauble*, 706 F.2d 1322, 1349 (5th Cir.1983), *cert. denied*, 465 U.S. 1005, 104 S.Ct. 996, 79 L.Ed.2d 229 (1984); *United States v. Hess*, 691 F.2d 188, 190–91 (4th Cir.1982). The trigger for forfeiture is conviction, not intervention by state banking regulators to freeze assets. *See* 18 U.S.C. § 1963(e). In this case, the defendants forfeited all of their interests in the enterprise that existed upon their conviction on January 24, 1992.

Consequently, the relevant questions are whether the forfeited funds were part of the enterprise (i.e., whether BCCI acquired title); whether the petitioner has a *legal* inter-

---

**7.** The Superintendent of Banks of the State of New York intervened on July 5, 1991. The intervention, and BCCI's worldwide collapse, was widely publicized. Unlike the Mistaken Wire Transfer Petitioners, The Pacific Bank had an opportunity to be proactive and institute preventive measures to avoid transferring funds to, or through, BCCI's accounts.

**8.** In its memoranda, the petitioner offers an argument that is not supported by any facts alleged in its L–Claim: that the regulatory intervention freezing BCCI's accounts prevented BCCI Cayman from accepting the payment order under N.Y.U.C.C. Art. 4–A–209(3). However, even had The Pacific Bank alleged facts to support its claim, it would fail as a matter of law. Article 4–A–209(3) prevents acceptance of a payment order where "the receiving bank is not permitted by law to receive credits for the beneficiary's account." *See* 6B Hawkland & Lawrence, U.C.C. Series § 4A–209:03, at 184–85 (1991). The Superintendent of Banks of the State of New York intervened and took possession of BCCI's accounts, including the account held by SPIB, but did not prohibit crediting BCCI accounts as a beneficiary bank under either § 209(3) or § 503. *See generally* 6B Hawkland & Lawrence, *supra* §§ 4A–209:03, at 184–85 and 4A–503:01, at 364–65.

est in the forfeited funds (i.e., standing); and if so, whether the petitioner has stated a claim on the merits sufficient to survive the government's motion to dismiss.

██ Here, it is beyond cavil that The Pacific Bank lacks a legal interest in a specific asset. As described above, the petitioner is simply a general creditor of BCCI. Moreover, given that the Court's Orders of Forfeiture reach only property located in the United States and not the entire estates of the four corporate defendants, these petitioners, as unsecured creditors of BCCI, do not have standing to seek amendment of the Court's Orders of Forfeiture under § 1963($l$)(2), and the L–Claim will be dismissed. *United States v. BCCI Holdings*, 46 F.3d at 1191.

**The merits**

██ Even were The Pacific Bank found to have standing under § 1963($l$)(2), it would not have the "vested" or "superior" rights, titles, or interests in forfeited property that are required by § 1963($l$)(6)(A). As recognized by the Second Circuit, "the categories of *vested* and *superior* are intended to cover those cases where the Court lacks jurisdiction over the property because it is not really 'property of the defendant.'" *Schwimmer*, 968 F.2d at 1581 (emphasis in the original). Because unsecured creditors lack property interests superior to a defendant's interests in particular assets or funds, their asserted interests do not "undermine the court's jurisdiction over the property, and [do] not invalidate the order of forfeiture. Thus, a general creditor has no interest in particular assets or funds that warrants an amendment of an order of forfeiture under § 1963($l$)(6)(A)." *Id.*

██ In addition to failing to meet the requirements of § 1963($l$)(6)(A), The Pacific Bank fails to satisfy the prerequisites of the only other basis for court-ordered relief, § 1963($l$)(6)(B), simply because there has been no purchase. When defining the third parties who could recover under subsection (B), Congress used the phrase "bona fide purchaser for value," a legal term of art referring to certain buyers of tangible property. *See Lavin*, 942 F.2d at 185; *Campos*, 859 F.2d at 1238; *Mageean*, 649 F.Supp. at

829. Though some courts applying § 1963($l$)(6)(B) or its equivalent in the Comprehensive Drug Abuse and Control Act, 21 U.S.C. § 853(n)(6)(B), have interpreted the phrase to include any person engaging in an arms' length business transaction, *see, e.g., Reckmeyer*, 836 F.2d at 208; *Mageean*, 649 F.Supp. at 829, this Court has not conferred such a broad interpretation on the phrase. As Justice O'Connor has noted, "a judge must presume that Congress chose its words with as much care as the judge [herself] brings to bear on the task of statutory interpretation," *FBI v. Abramson*, 456 U.S. 615, 635, 102 S.Ct. 2054, 2066, 72 L.Ed.2d 376 (1982) (dissenting opinion), and the literal language of a statute should be conclusive in the absence of a clearly expressed legislative intent to the contrary. *See Russello v. United States*, 464 U.S. 16, 20, 104 S.Ct. 296, 299, 78 L.Ed.2d 17 (1983); *see also Evans v. United States*, 504 U.S. 255, 260, 112 S.Ct. 1881, 1885, 119 L.Ed.2d 57 (1992) ("It is a familiar 'maxim that a statutory term is generally presumed to have its common-law meaning.'") (quoting *Taylor v. United States*, 495 U.S. 575, 592, 110 S.Ct. 2143, 2155, 109 L.Ed.2d 607 (1990)).

██ Congress could easily have adopted language in § 1963($l$)(6)(B) expressly providing protection to all parties engaged in arms length transactions with defendants, and its failure to do so is strong evidence of a desire not to provide such a wide avenue of relief. The Senate Judiciary Committee's report on the statute does not provide persuasive evidence of a clear intent to the contrary. It is true that the report recognized that the purpose of the relation back doctrine codified at § 1963(c) was to "close a potential loophole in current law whereby the criminal forfeiture sanction could be avoided by transfers that were not *'arms' length.'*" S.Rep. No. 225, 98th Cong., 2d Sess. 200–01, *reprinted in* 1984 U.S.Code Cong. & Ad.News 3383–3384 ("S.Rep.") (emphasis added). However, when the report addressed the nature of the relief available to third parties under § 1963($l$)(6), the provision at issue here, it used narrower language and spoke only of vested or superior interest holders and "bona fide *purchasers* for value." S.Rep. at 209

(emphasis added). Accordingly, in light of the clear statutory language and the absence of an unambiguously expressed contrary intent of Congress, the phrase "bona fide purchaser for value" is interpreted to refer only to a certain class of buyers of tangible property. Because the petitioners did not obtain their alleged interests through the purchase of tangible property, they would not be entitled to relief under § 1963(*l*)(6)(B) even were they found to have standing under § 1963(*l*)(2).

■ The Pacific Bank also makes equitable arguments why the forfeited funds should be excluded from the Order of Forfeiture. However, the Court's role in a proceeding under § 1963(*l*) is based on law, not equity. Equitable arguments are best presented to the liquidator's of BCCI[9] or to the Department of Justice under § 1963(g). *See United States v. BCCI Holdings*, 48 F.3d 551, 555 (D.C.Cir.), *cert. denied sub nom. Liquidation Comm'n for BCCI (Overseas) Ltd. v. U.S.,* —— U.S. ——, 116 S.Ct. 563, 133 L.Ed.2d 489 (1995).

### Conclusion

For the reasons stated above, it is hereby

**ORDERED** that the government's Motion to Dismiss is granted; and it is

**FURTHER ORDERED** that The Pacific Bank's L–Claim is dismissed. Judgment shall be entered separately in accordance with Fed.R.Civ.P. 58.

IT IS SO ORDERED.

---

9. The Pacific Bank's claim with the Official Liquidators has been denied. *See* Supplemental

Memorandum (filed Apr. 28, 1994).