**UNITED STATES of America**

v.

**BCCI HOLDINGS (LUXEMBOURG), S.A., Bank of Credit and Commerce International, S.A., Bank of Credit and Commerce International (Overseas) Limited, and International Credit and Investment Company (Overseas) Limited, Defendants.**

Crim. Action No. 91–0655 (JHG).

United States District Court,
District of Columbia.

Aug. 26, 1997.

**450**

U.S. Dept. of Justice, Asset Forfeiture Office, Stefan D. Cassella, for the Government.

Joseph M. Hassett, Albert W. Turnbull, Hogan & Hartson, L.L.P., Washington, DC, Richard A. Martin, Santo F. Russo, Werbel & Carnelutti, New York City, for Defendants.

### *In re* Fifth Round Petition of Banca Nazionale Del Lavoro, S.p.A. Italy

### *MEMORANDUM OPINION AND ORDER*

JOYCE HENS GREEN, District Judge.

Presently before the Court is the United States' motion to dismiss the Fifth Round Petition of Petition of Banca Nazionale Del Lavoro, S.P.A. Italy ("BNL"), which was filed pursuant to 18 U.S.C. § 1963(*l*) ("L–Claim"). For the reasons stated below, the motion to dismiss will be granted, and the L–Claim will be dismissed.

**Background**

The facts surrounding BCCI's collapse are well known in the financial and legal communities, but certain facts bear repeating to set the stage for resolving the instant motion to dismiss this L–Claim.[1] In early 1991, the Bank of England received troubling information about BCCI's financial condition and integrity. In response, it commissioned a special audit, which "disclosed evidence of a complex and massive fraud at BCCI, including substantial loan and treasury account losses, misappropriation of funds, unrecorded deposits, the creation and manipulation of fictitious accounts to conceal bank losses, and concealment from regulatory authorities of BCCI's mismanagement and true financial position." Corrigan, Mattingly & Taylor, *The Federal Reserve's Views on BCCI*, 26 Int'l Law. 963, 970–71 (1992) (based on testimony before the Committee on Banking, Finance and Urban Affairs of the United States House of Representatives on September 3, 1991).

The results of the audit were shared with regulators in other countries, and, on July 5, 1991, banking regulators in the United Kingdom, Luxembourg and the United States, froze assets owned or controlled by BCCI. In New York, the Superintendent of Banks seized BCCI's assets at various New York banks, including those at Bankamerica International ("Bankamerica"). By July 6th, eighteen countries had shut down BCCI's operations in their jurisdictions, and, as of July 29, 1991, forty-four countries had closed down BCCI branches.

On November 15, 1991, a three-count Indictment, which included charges of conspiracy, wire fraud and racketeering against BCCI, was filed in this Court. On January 24, 1992, this Court, following findings of fact and conclusions of law with supporting reasons made in open court, accepted the pleas of guilty of the four corporate defendants, collectively known as BCCI, and the Plea Agreement between them and the United States of America. See Transcript of Guilty

---

**1.** "BCCI," as used herein, refers collectively to BCCI Holdings (Luxembourg) S.A., its two operating subsidiaries, Bank of Credit and Commerce International, S.A., and Bank of Credit and Commerce International (Overseas) Limited, and International Credit and Investment Company (Overseas) Limited, an entity previously found to be the alter ego of the other BCCI entities.

Plea Proceedings at 7 (Jan. 24, 1992). In accordance with 18 U.S.C. § 1963, this Court then entered an Order of Forfeiture.

Under paragraph 9 of the Plea Agreement and pursuant to the Order of Forfeiture, BCCI forfeited all of its property interests in the United States. Pursuant to paragraph 1(e) of the Forfeiture Order, the corporate defendants forfeited to the United States their ownership interests in all property located in the United States, including, without limitation, real property and all tangible and intangible personal property, however held, whether subsequently identified, determined or discovered in the course of the ongoing liquidation proceedings described therein or otherwise identified, determined, or discovered in any manner at any time (excluding property brought into the United States by or on behalf of Court–Appointed Fiduciaries of BCCI in the course of the management or disbursement of the liquidation estates).

Attached to the First Order of Forfeiture was a listing of BCCI accounts, with corresponding numbers, names, and approximate balances, which the United States Marshals Service was directed to seize forthwith. Because the government was unable to verify certain information concerning additional forfeitable accounts at the time the Order of Forfeiture was entered, the Court issued a First Supplemental Order on January 31, 1992, which directed immediate seizure of the specific assets listed therein. The Court later amended the Order of Forfeiture to include additional assets, including property set forth in Second, Third, Fourth and Fifth Supplemental Lists of Forfeited Property. See Order of Forfeiture of July 29, 1992 (Second Order of Forfeiture); Order of Forfeiture of August 19, 1993 (Third Order of Forfeiture); Fourth Order of Forfeiture (December 21, 1994); Fifth Order of Forfeiture (September 20, 1996). Attached to the Fifth Order of Forfeiture, which is relevant to BNL's L–Claim presently before the Court,

was the Fifth Supplemental List of Forfeited Property.

The Plea Agreement also established the Worldwide Victims Fund and the U.S. Fund. Under the terms of the Plea Agreement, forfeited assets were to be disbursed in equal amounts to the Worldwide Victims Fund and the U.S. Fund. See Plea Agreement ¶ 11(c). The broad purpose of the Worldwide Victims Fund, operated by the Court–Appointed Fiduciaries, is to distribute funds "only to innocent depositors, creditors and other victims of BCCI whose claims are not derived directly or indirectly through violations of United States or other laws concerning narcotics, terrorism, money laundering, crimes of violence, or other acts generally recognized as felonies or similar crimes under the law of countries subscribing to recognized norms of international justice." Id. ¶ 14.

The purpose of the U.S. Fund is more specific, but no less compensatory. In addition to allowing for reimbursement of the costs of investigation and prosecution of BCCI, bank insurance and other matters, the U.S. Fund is also available to provide "restitution to victims of BCCI, which may include remission to the Court Appointed Fiduciaries in accordance with 18 U.S.C. § 1963(g) for the purpose of facilitating an increase in assets available for distribution by the Court–Appointed Fiduciaries to innocent worldwide victims of BCCI, and which may include claims related to the failure of CenTrust, if any." Id. ¶ 12(f). As a result of BCCI's guilty plea and the subsequent criminal forfeiture proceedings, as of July 1996, the United States had "recovered nearly $800 million, virtually all of which has been, or will be, distributed to the victims of the fraud." Testimony of Stefan Cassella before the Judiciary Committee of the House of Representatives (July 22, 1996), 1996 WL 410099, *5 (F.D.C.H.).[2]

In compliance with 18 U.S.C. § 1963(l)(1) and to inform third parties of their potential rights to seek recovery of assets declared

---

2. In 1995, over $225 million was disbursed to the Court Appointed Fiduciaries for the Worldwide Victims Fund. See Notice to the Court at 1 (filed Aug. 13, 1996). On August 1, 1996, the United States disbursed an additional $83,651,-863.24, id. at 2, and, on May 22, 1997, Attorney General Janet Reno "determined that the United States would transfer 100 percent of its share of the forfeited funds to the Worldwide Victims Fund so that the funds might be distributed to all BCCI victims equally on a pro rata basis." Notice to the Court at 2 (filed July 11, 1997).

forfeited in the Fifth Order of Forfeiture, the United States published notice of the Order of Forfeiture, as amended, during the period from November 15, 1996 until December 23, 1996 in eleven major newspapers of general circulation including the *Wall Street Journal,* the *New York Times,* the *International Herald Tribune,* the *Los Angeles Daily Journal,* the *Washington Post,* and *USA Today. See* United States' Notice to the Court at 1 & Exhibit A (Docket No. 1800). In addition, personal notice was sent to 163 persons and entities. *Id.* Through a timely filed Fifth Round L–Claim, BNL has asserted an interest in $100,500, as represented by a credit in BCCI London's account maintained at Bankamerica.

For the purposes of this motion, the Court assumes true the facts alleged by the petitioner in its L–Claim. On July 8, 1991, BNL instructed Bankamerica to transfer $100,500 from its "nostro" account with Bankamerica to its "nostro" account with at BCCI (London).[3] Bankamerica executed the transaction by transferring $100,500 from BNL's account to BCCI (London)'s account at Bankamerica, for further credit to BNL's account with BCCI (London). However, due to the regulatory intervention on July 5, 1991, BCCI (London)'s account was frozen and BCCI never credited BNL.

On July 19, 1991, BNL requested confirmation that Bankamerica had executed the transfer, and in the event it had not, it requested that the transfer be canceled. Later, BNL learned that the funds had been seized by New York State banking authorities: "Evidently, the Superintendent seized BNL–ROME's account at BCCI under the *mistaken belief* that BNL–ROME's deposit was part of the general assets of BCCI." L–Claim ¶ 9 (emphasis in original).[4] Through the instant petition, BNL "simply seeks to reacquire the money it intended to deposit in its own account." *Id.* ¶ 10.

In its motion, the United States seeks dismissal on the grounds of standing, arguing that because BCCI (London) acquired title to the funds upon acceptance of the payment order, BNL is a general creditor of BCCI. BNL filed a brief in opposition but did not request oral argument.

### Discussion

BCCI's assets were forfeited pursuant to 18 U.S.C. § 1963,[5] which sets forth an orderly procedure by which third parties seeking to recover interests in forfeited property may obtain judicial resolution of their claims. It permits any person, other than the defendant, claiming a legal interest in forfeited property to petition the Court for a hearing to adjudicate the validity of that interest. 18

3. BNL explains "nostro/vostro" or "ours/yours" accounts as follows:

A "nostro" account is the foreign currency account which a bank effecting a transfer of funds establishes with a correspondent bank. Thus, a U.S. bank (Bank A) transferring funds to a French bank (Bank B) may instruct the French banking institution to debit Bank A's French franc "nostro" account. Conversely, a "vostro" account refers to the U.S. dollar account held with Bank A by Bank B.

Mem. Opp. at 3 (citing Ambrosia, *New SWIFT Rules on the Liability of Financial Institutions for Interest Losses Caused by Delay in International Fund Transfers*, 13 Cornell Int'l L.J. 311, 312 (1980)).

4. The New York Superintendent later determined that the funds were not part of the New York liquidation estate and, accordingly, such funds were forfeited pursuant to this Court's Order of February 24, 1995, and included in the Fifth Order of Forfeiture.

5. 18 U.S.C. § 1963(a) provides, in relevant part:

Whoever violates any provision of section 1962 of this chapter shall ... forfeit to the United States, irrespective of any provision of State law—

(1) any interest the person has acquired or maintained in violation of section 1962;

(2) any—

(A) interest in;

(B) security of;

(C) claim against; or

(D) property or contractual right of any kind affording a source of influence over;

any enterprise which the person has established, operated, controlled, conducted, or participated in the conduct of, in violation of section 1962; and

(3) any property constituting, or derived from, any proceeds which the person has obtained directly or indirectly, from racketeering activity or unlawful debt collection in violation of section 1962.

The court, in imposing sentence on such person shall order ... that the person forfeit to the United States all property described in this subsection.

U.S.C. § 1963(*l*)(2).[6] Section 1963(*l*)(6) sets forth the substantive elements that a third party must establish to obtain amendment of an order of forfeiture:

> If, after the hearing, the court determines that the petitioner has established by a preponderance of the evidence that—
>
>> (A) the petitioner has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section; or
>>
>> (B) the petitioner is a bona fide purchaser for value of the right, title, or interest in the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section;
>
> the court shall amend the order of forfeiture in accordance with its determination.

18 U.S.C. § 1963(*l*)(6).

A petitioner must first establish standing. Only by establishing standing and alleging the requisite elements of either § 1963(*l*)(6)(A) or § 1963(*l*)(6)(B) may a party obtain judicial relief from an order of forfeiture. *See United States v. BCCI Holdings (Luxembourg), S.A., et al. (In re Petition of Pacific Bank)*, 956 F.Supp. 5, 10 (D.D.C.1997); *United States v. BCCI Holdings (Luxembourg), S.A., et al. (In re Petition of BCCI(O) Foreign Branches)*, 833 F.Supp. 32, 36 (D.D.C.1993), *aff'd*, 46 F.3d 1185, 1188 (D.C.Cir.), *cert. denied sub norm. Chawla v. United States*, 515 U.S. 1160, 115 S.Ct. 2613, 132 L.Ed.2d 856 (1995); *United States v. BCCI Holdings (Luxembourg), S.A., et al. (In re Petition of Chawla)*, 833

F.Supp. 9, 13 (D.D.C.1993), *aff'd*, 46 F.3d 1185, 1188 (D.C.Cir.), *cert. denied sub nom. Chawla v. United States*, 515 U.S. 1160, 115 S.Ct. 2613, 132 L.Ed.2d 856 (1995); *see also (United States v. Schwimmer*, 968 F.2d 1570, 1584 (2nd Cir.1992); *United States v. Lavin*, 942 F.2d 177, 187 (3rd Cir.1991)). If a third party fails to allege in its petition all elements necessary for recovery, including those relating to standing, the court may dismiss the petition without providing a hearing. *See In re Petition of Pacific Bank*, 956 F.Supp. at 10; *see also* S.Rep. No. 225, 98th Cong., 1st Sess. 191, 208 n. 46 (Sept. 12, 1983); *United States v. Campos*, 859 F.2d 1233, 1240 (6th Cir.1988); *United States v. Mageean*, 649 F.Supp. 820, 825 (D.Nev.1986), *aff'd without opinion*, 822 F.2d 62 (9th Cir. 1987).

A motion to dismiss under Fed.R.Civ.P. 12(b)(6) may be granted if it appears that the petitioner can prove no facts that would entitle it to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Kenneda v. United States*, 880 F.2d 1439, 1442 (D.C.Cir.1989). The Court accepts well-pleaded facts as true and construes the complaint liberally, granting a petitioner the benefit of any reasonable inferences that can be derived from the facts alleged. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). The Court is not required, however, to accept inferences unsupported by the facts alleged or legal conclusions that are cast as factual allegations. *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1275 (D.C.Cir.1994).

Section 1963(*l*)(2) requires a party to assert "a legal interest in property forfeited to the United States" to have standing. This requirement is imposed to further the purpose of an L–Claim proceeding, which, while ancillary to the underlying criminal case, is intended to ensure that property forfeited to the United States was that of the defendant;

---

**6.** This provision provides:

Any person other than the defendant, asserting a legal interest in property which has been ordered forfeited to the United States pursuant to this section may, within thirty days of the final publication of notice or his receipt of notice under paragraph (1), whichever is earlier, petition the court for a hearing to adjudicate the validity of his alleged interest in the property. The hearing shall be held before the court alone, without a jury.

it does not attempt to divide the defendant's estate among competing claimants. *See (United States v. BCCI Holdings (Luxembourg), S.A. (In re Petition of General Creditors),* 814 F.Supp. 106, 110 (D.D.C.1993)). This latter task is properly performed at a liquidation proceeding, where all parties without a "legal interest" in forfeited property can recover on a *pro rata* basis with the many other claimants to the debtor's estate. *Id.* at 111; *see Downriver Community Fed. Credit Union v. Penn Square Bank,* 879 F.2d 754 (10th Cir.1989), *cert. denied,* 493 U.S. 1070, 110 S.Ct. 1112, 107 L.Ed.2d 1019 (1990); *First Empire Bank–New York v. F.D.I.C.,* 572 F.2d 1361 (9th Cir.1978), *cert. denied,* 439 U.S. 919, 99 S.Ct. 293, 58 L.Ed.2d 265 (1978).

■■■ The critical inquiry in an L–Claim proceeding is, therefore, ownership of the disputed funds. As recognized by this Court and most, if not all, other courts addressing the issue, an unsecured creditor does not possess an interest in any specific asset of a debtor and merely has a general interest in the debtor's entire estate. *See In re Petition of Chawla,* 46 F.3d at 1191; *In re Petition of Pacific Bank,* 956 F.Supp. at 10; *see also Schwimmer,* 968 F.2d at 1581; *Campos,* 859 F.2d at 1240; *United States v. Reckmeyer,* 836 F.2d 200, 206 & n. 3 (4th Cir.1987); *Mageean,* 649 F.Supp. at 828. Because a general creditor is unable to assert an interest in a specific asset, it cannot assert a legal right, title, or interest "in property which has been ordered forfeited" as required by § 1963(*l*)(2), at least in situations where, like here, a defendant's entire estate is not subject to forfeiture. *In re Petition of Chawla,* 46 F.3d at 1191; *see Reckmeyer,* 836 F.2d at 206 n. 3 ("It is the dilemma of linking their interest to a specific asset rather than the problem of asserting a legal interest in the debtor's estate that frustrates general creditors who attempt to contest ... forfeitures."). Accordingly, absent a showing of an interest in a specific asset, the petitioners would lack standing to assert a claim in these L–Claim proceedings.

■■■ Examined in light of Article 4–A of the New York Uniform Commercial Code ("N.Y.U.C.C.") and the law applicable to standing, the L–Claim must be dismissed. Accepting the facts in the L–Claim as true, BNL has merely described an incomplete wire transfer. As such, BCCI (London) acquired title, N.Y.U.C.C. §§ 4–A–104(1), 4–A–209(2); *see United States v. BCCI Holdings (Luxembourg) S.A., et al., (In re Mistaken Wire Transfer Petitioners),* 1994 WL 914460 *5 (D.D.C., Oct.28, 1994); *see also United States v. BCCI Holdings (Luxembourg) S.A., et al. (In re Petition of Pacific Bank),* 956 F.Supp. at 5, 11 (D.D.C.1997); *Shawmut Worcester County Bank v. First American Bank & Trust,* 731 F.Supp. 57, 60 (D.Mass. 1990), and BNL was left with a cause of action against BCCI—an unsecured obligation making it a general creditor. Since it is the law of this Circuit that general creditors lack standing to assert claims under 18 U.S.C. § 1963(*l*), the petition will be dismissed. *In re Petition of Chawla,* 46 F.3d 1185, 1191 (D.C.Cir.), *cert. denied sub norm. Chawla v. United States,* 515 U.S. 1160, 115 S.Ct. 2613, 132 L.Ed.2d 856 (1995). Moreover, such an inability to assert a legal interest in a specific asset would undermine the petitioner's claim on the merits. *See, e.g., In re Petition of General Creditors,* 814 F.Supp. at 110–11.

■■■ In its L–Claim, BNL alleged no facts that either indicated or were subject to a reasonable inference that the deposits in its "nostro" account with BCCI (London) were other than general deposits. However, in its memorandum in opposition to the government's motion to dismiss, it offers a legal theory which, in effect, would stand for the proposition that all "nostro" accounts are special deposits and that all wire transfers conducted through such "nostro" accounts are transfers of special deposits. To state this argument makes apparent the reason for its rejection. *In re Petition of Pacific Bank,* 956 F.Supp. at 11 n. 6. As in *Pacific Bank,* where the Court was not persuaded that a wire transfer ordered for a specific purpose meant that the funds so transferred constituted "special deposits," *id.; see also United States v. BCCI Holdings (Luxembourg), S.A. (In re* First and *Second Round Petitions of Hubei Provincial Int'l Trust & Investment Corp.),* slip op. at 16–17, —— F.Supp. ——,

—— – —— (D.D.C. Aug. 26, 1997), the Court is unpersuaded here that "nostro" accounts necessarily constitute special deposits.[7] While the Court assumes true the facts pled in the petitioner's verified L–Claim, it is under no obligation to accept the petitioner's legal conclusions regarding the nature of its deposits, particularly where those conclusions are unsupported by the facts in its L–Claim or reasonable inferences thereto. *Kowal,* 16 F.3d at 1275.

Accepting *arguendo* that BNL's legal argument is more narrow than it appears and is thus confined to the specific "nostro" account at BCCI (London), the Court remains unpersuaded. Despite BNL's characterization of the nature of its account, neither the attachments to BNL's memorandum in opposition nor BNL's description of the way in which its account was used suggests that the account with BCCI was other than a general deposit: "A deposit is general where a sum of money is left with a bank for safe-keeping, subject to order, and payable, not in the specific money deposited, but in an equal sum, whether it bears interest or not. It is a deposit of money in the usual course of banking business generally to the credit of the depositor to be drawn on in the usual course of such business." 5A Michie on Banks and Banking § I, at 36–39 (1994 Repl.Vol.); *see* 5B Michie on Banks and Bank § 328, at 429–40 (1991 Repl.Vol.).

Putting aside for the moment that BNL has not alleged in its L–Claim that its account constituted a special deposit (let alone included any supporting facts), the agreement it cites in its memorandum as evidence of a special deposit shows nothing of the sort: "Please note that all our branches in Italy, besides this Head Office, are authorized to draw on [the account in our name] up to any available amount. Furthermore all remittances from our branches or made by our Correspondents in their favour, as well as cover of your payment orders are to be credited in this account." BNL Letter of Sept. 19, 1983, to BCCI (London), Ex. B to Pietro Plantamura Affidavit ("Plantamura Aff.") (cited as evidence of special agreement in Plantamura Aff. ¶ 7 and BNL's Opp. at 9). BCCI (London)'s response, which reflects the parties' special understanding according to BNL's memorandum, is no more persuasive: "We have allocated U.S. Dollar Account No. 41109915 for your good bank in the books of our London branch, and we now look forward to receiving an initial deposit to activate this account. The initial deposit may be kindly routed through our London branch's account No. 48586050 with Bankamerica International, New York." Ex. A to Plantamura Aff. The account was then used to facilitate international currency exchange, see Plantamura Aff. ¶ 7, which constitutes a normal activity in the usual course of international banking.

Contrary to BNL's argument, the attachments to its memorandum reflect nothing more than the "deposit of money in the usual course of banking business generally to the credit of the depositor to be drawn on in the usual course of such business." 5A Michie on Banks and Banking, *supra* § 1, at 36–39. Conspicuously absent from the agreement upon which BNL's memorandum relies is any restriction whatsoever prohibiting BCCI (London) from co-mingling BNL's deposits or using such sums for BCCI's own benefit. *See* 5B Michie on Banks and Bank § 328, at 436. The mere fact that "nostro" accounts do not bear interest is not dispositive. 5A Michie on Banks and Banking, *supra* § 3, at 37.

The government's motion will be granted.

### CONCLUSION

Accordingly, it is hereby

**ORDERED** that the United States' motion to dismiss is granted; BNL's L–Claims is dismissed.

IT IS SO ORDERED.

---

**7.** Had the petitioner alleged in its L–Claim that its account with BCCI (London) was a special deposit and then alleged supporting facts therein, the Court would, of course, have accepted those facts as true and denied the instant motion to dismiss. Deposits are presumed to be general, unless proven otherwise, and the absence of any factual allegation in the L–Claim here creates a deafening silence.