UNITED STATES of America

v.

BCCI HOLDINGS (LUXEMBOURG), S.A., Bank of Credit and Commerce International, S.A., Bank of Credit and Commerce International (Overseas) Limited, and International Credit and Investment Company (Overseas) Limited, Defendants.

Crim. Action No. 91–0655 (JHG).

United States District Court, District of Columbia.

Aug. 26, 1997.

U.S. Department of Justice, Asset Forfeiture Office, Stefan D. Cassella, Washington, DC, for U.S.

Lorelie S. Masters, Anderson Kill & Olick, LLP, for Defendants.

## *In re* Fifth Round Petition of Banca Monte dei Paschi di Siena S.p.A.

### *MEMORANDUM OPINION AND ORDER*

JOYCE HENS GREEN, District Judge.

Presently before the Court is the United States' motion to dismiss the Fifth Round Petition of Banca Monte dei Paschi di Siena S.p.A. ("MPS"), which was filed pursuant to 18 U.S.C. § 1963(*l*) ("L–Claim"). For the reasons stated below, the motion to dismiss will be granted, and the L–Claim will be dismissed.

### Background

The facts surrounding BCCI's collapse are well known in the financial and legal communities, but certain facts bear repeating to set the stage for resolving the instant motion to dismiss this L–Claim.[1] In early 1991, the Bank of England received troubling information about BCCI's financial condition and integrity. In response, it commissioned a special audit, which "disclosed evidence of a complex and massive fraud at BCCI, includ-

ing substantial loan and treasury account losses, misappropriation of funds, unrecorded deposits, the creation and manipulation of fictitious accounts to conceal bank losses, and concealment from regulatory authorities of BCCI's mismanagement and true financial position." Corrigan, Mattingly & Taylor, *The Federal Reserve's Views on BCCI*, 26 Int'l Law. 963, 970–71 (1992) (based on testimony before the Committee on Banking, Finance and Urban Affairs of the United States House of Representatives on September 3, 1991).

The results of the audit were shared with regulators in other countries, and, on July 5, 1991, banking regulators in the United Kingdom, Luxembourg and the United States, froze assets owned or controlled by BCCI. In New York, the Superintendent of Banks seized BCCI's assets at various New York banks, including those at American Express Bank ("AEB"). By July 6th, eighteen countries had shut down BCCI's operations in their jurisdictions, and, as of July 29, 1991, forty-four countries had closed down BCCI branches.

On November 15, 1991, a three-count Indictment, which included charges of conspiracy, wire fraud and racketeering against BCCI, was filed in this Court. On January 24, 1992, this Court, following findings of fact and conclusions of law with supporting reasons made in open court, accepted the pleas of guilty of the four corporate defendants, collectively known as BCCI, and the Plea Agreement between them and the United States of America. *See* Transcript of Guilty Plea Proceedings at 7 (Jan. 24, 1992). In accordance with 18 U.S.C. § 1963, this Court then entered an Order of Forfeiture.

Under paragraph 9 of the Plea Agreement and pursuant to the Order of Forfeiture, BCCI forfeited all of its property interests in the United States. Pursuant to paragraph 1(e) of the Forfeiture Order, the corporate defendants forfeited to the United States their ownership interests in all property located in the United States, including, without

---

**1.** "BCCI," as used herein, refers collectively to BCCI Holdings (Luxembourg) S.A., its two operating subsidiaries, Bank of Credit and Commerce International, S.A., and Bank of Credit and Com-

merce International (Overseas) Limited, and International Credit and Investment Company (Overseas) Limited, an entity previously found to be the alter ego of the other BCCI entities.

limitation, real property and all tangible and intangible personal property, however held, whether subsequently identified, determined or discovered in the course of the ongoing liquidation proceedings described therein or otherwise identified, determined, or discovered in any manner at any time (excluding property brought into the United States by or on behalf of Court–Appointed Fiduciaries of BCCI in the course of the management or disbursement of the liquidation estates).

Attached to the First Order of Forfeiture was a listing of BCCI accounts, with corresponding numbers, names, and approximate balances, which the United States Marshals Service was directed to seize forthwith. Because the government was unable to verify certain information concerning additional forfeitable accounts at the time the Order of Forfeiture was entered, the Court issued a First Supplemental Order on January 31, 1992, which directed immediate seizure of the specific assets listed therein. The Court later amended the Order of Forfeiture to include additional assets, including property set forth in Second, Third, Fourth and Fifth Supplemental Lists of Forfeited Property. *See* Order of Forfeiture of July 29, 1992 (Second Order of Forfeiture); Order of Forfeiture of August 19, 1993 (Third Order of Forfeiture); Fourth Order of Forfeiture (December 21, 1994); Fifth Order of Forfeiture (September 20, 1996). Attached to the Fifth Order of Forfeiture, which is relevant to MPS' L–Claim presently before the Court, was the Fifth Supplemental List of Forfeited Property.

The Plea Agreement also established the Worldwide Victims Fund and the U.S. Fund. Under the terms of the Plea Agreement, forfeited assets were to be disbursed in equal amounts to the Worldwide Victims Fund and the U.S. Fund. *See* Plea Agreement ¶ 11(c). The broad purpose of the Worldwide Victims Fund, operated by the Court–Appointed Fiduciaries, is to distribute funds "only to innocent depositors, creditors and other victims of BCCI whose claims are not derived directly or indirectly through violations of United States or other laws concerning narcotics, terrorism, money laundering, crimes of violence, or other acts generally recognized as felonies or similar crimes under the law of countries subscribing to recognized norms of international justice." *Id.* ¶ 14.

The purpose of the U.S. Fund is more specific, but no less compensatory. In addition to allowing for reimbursement of the costs of investigation and prosecution of BCCI, bank insurance and other matters, the U.S. Fund is also available to provide "restitution to victims of BCCI, which may include remission to the Court Appointed Fiduciaries in accordance with 18 U.S.C. § 1963(g) for the purpose of facilitating an increase in assets available for distribution by the Court–Appointed Fiduciaries to innocent worldwide victims of BCCI, and which may include claims related to the failure of CenTrust, if any." *Id.* ¶ 12(f). As a result of BCCI's guilty plea and the subsequent criminal forfeiture proceedings, by July 1996 the United States had "recovered nearly $800 million, virtually all of which has been, or will be, distributed to the victims of the fraud." Testimony of Stefan Cassella before the Judiciary Committee of the House of Representatives (July 22, 1996), 1996 WL 410099, *5 (F.D.C.H.).[2]

In compliance with 18 U.S.C. § 1963(*l*)(1) and to inform third parties of their potential rights to seek recovery of assets declared forfeited in the Fifth Order of Forfeiture, the United States published notice of the Order of Forfeiture, as amended, during the period from November 15, 1996 until December 23, 1996 in eleven major newspapers of general circulation including the *Wall Street Journal,* the *New York Times,* the *International Herald Tribune,* the *Los Angeles Daily Journal,* the *Washington Post,* and *USA Today. See* United States' Notice to the Court at 1 & Exhibit A (Docket No. 1800). In addition, personal notice was sent to 163 persons and

---

**2.** In 1995, over $225 million was disbursed to the Court Appointed Fiduciaries for the Worldwide Victims Fund. *See* Notice to the Court at 1 (filed Aug. 13, 1996). On August 1, 1996, the United States disbursed an additional $83,651,-863.24, *id.* at 2, and, on May 22, 1997, Attorney General Janet Reno "determined that the United States would transfer 100 percent of its share of the forfeited funds to the Worldwide Victims Fund so that the funds might be distributed to all BCCI victims equally on a pro rata basis." Notice to the Court at 2 (filed July 11, 1997).

entities. *Id.* Through a timely filed Fifth Round L–Claim, MPS has asserted an interest in $22,500, as represented by a credit in BCCI London's account maintained at AEB.

For the purposes of this motion, the Court assumes true the facts alleged by MPS. MPS is a banking institution organized and existing under the laws of the Republic of Italy with its head office in Siena, Italy. On or about June 18, 1991, Nazir & Co. ("Nazir") issued a check in the amount of $22,500 to Middle East Srl, a customer of MPS. The check was drawn on an account at BCCI London, and, on behalf of Middle East Srl, MPS sent the check for collection to BCCI London. On June 27, 1991, BCCI London debited Nazir's account in the amount of $22,500. On July 1, 1991, BCCI London issued a payment order to its correspondent in New York, AEB, directing it to pay the Bank of New York ("BNY"). However, on July 2, 1991, BNY "returned" the "proceeds of the collection in favor of Middle East, the ultimate beneficiary of the collection" to AEB where the credit remained until July 5, 1991, when BCCI's accounts were frozen. L–Claim ¶¶ 10–12. MPS states that the "amount represents a payment due from a BCCI depositor to an MPS depositor," *id.* ¶ 12, and "[h]ad the Bank of New York been able to properly apply the wire transfer, the funds would have been credited to MPS" before regulatory authorities intervened on July 5, 1991. *Id.* ¶ 13.

In its motion, the United States seeks dismissal on the grounds of standing, arguing that regardless of whether the transaction is viewed as a dishonored check or an incomplete wire transfer, MPS is merely a general creditor of BCCI. MPS filed a brief in opposition but did not request oral argument.

## Discussion

BCCI's assets were forfeited pursuant to 18 U.S.C. § 1963,[3] which sets forth an orderly procedure by which third parties seeking to recover interests in forfeited property may obtain judicial resolution of their claims. It permits any person, other than the defendant, claiming a legal interest in forfeited property to petition the Court for a hearing to adjudicate the validity of that interest. 18 U.S.C. § 1963(*l*)(2).[4] Section 1963(*l*)(6) sets forth the substantive elements that a third party must establish to obtain amendment of an order of forfeiture:

> If, after the hearing, the court determines that the petitioner has established by a preponderance of the evidence that—
> (A) the petitioner has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section; or
> (B) the petitioner is a bona fide purchaser for value of the right, title, or interest in the property and was at the time of

3. 18 U.S.C. § 1963(a) provides, in relevant part:

> Whoever violates any provision of section 1962 of this chapter shall ... forfeit to the United States, irrespective of any provision of State law—
> (1) any interest the person has acquired or maintained in violation of section 1962;
> (2) any—
> (A) interest in;
> (B) security of;
> (C) claim against; or
> (D) property or contractual right of any kind affording a source of influence over;
> any enterprise which the person has established, operated, controlled, conducted, or participated in the conduct of, in violation of section 1962, and
> (3) any property constituting, or derived from, any proceeds which the person has ob-

tained directly or indirectly, from racketeering activity or unlawful debt collection in violation of section 1962.

> The court, in imposing sentence on such person shall order ... that the person forfeit to the United States all property described in this subsection.

4. This provision provides:

> Any person other than the defendant, asserting a legal interest in property which has been ordered forfeited to the United States pursuant to this section may, within thirty days of the final publication of notice or his receipt of notice under paragraph (1), whichever is earlier, petition the court for a hearing to adjudicate the validity of his alleged interest in the property. The hearing shall be held before the court alone, without a jury.

purchase reasonably without cause to believe that the property was subject to forfeiture under this section;

the court shall amend the order of forfeiture in accordance with its determination. 18 U.S.C. § 1963(*l*)(6).

■ A petitioner must first establish standing. Only by establishing standing and alleging the requisite elements of either § 1963(*l*)(6)(A) or § 1963(*l*)(6)(B) may a party obtain judicial relief from an order of forfeiture. *See United States v. BCCI Holdings (Luxembourg), S.A., et al. (In re Petition of Pacific Bank)*, 956 F.Supp. 5, 10 (D.D.C.1997); *United States v. BCCI Holdings (Luxembourg), S.A., et al. (In re Petition of BCCI(O) Foreign Branches)*, 833 F.Supp. 32, 36 (D.D.C.1993), *aff'd*, 46 F.3d 1185, 1188 (D.C.Cir.), *cert. denied sub nom. Chawla v. United States*, 515 U.S. 1160, 115 S.Ct. 2613, 132 L.Ed.2d 856 (1995); *United States v. BCCI Holdings (Luxembourg), S.A., et al. (In re Petition of Chawla)*, 833 F.Supp. 9, 13 (D.D.C.1993), *aff'd*, 46 F.3d 1185, 1188 (D.C.Cir.), *cert. denied sub nom. Chawla v. United States*, 515 U.S. 1160, 115 S.Ct. 2613, 132 L.Ed.2d 856 (1995); *see also United States v. Schwimmer*, 968 F.2d 1570, 1584 (2nd Cir.1992); *United States v. Lavin*, 942 F.2d 177, 187 (3rd Cir.1991). If a third party fails to allege in its petition all elements necessary for recovery, including those relating to standing, the court may dismiss the petition without providing a hearing. *See In re Petition of Pacific Bank*, 956 F.Supp. at 10; *see also* S.Rep. No. 225, 98th Cong., 1st Sess. 191, 208 n. 46 (Sept. 12, 1983); *United States v. Campos*, 859 F.2d 1233, 1240 (6th Cir.1988); *United States v. Mageean*, 649 F.Supp. 820, 825 (D.Nev.1986), *aff'd without opinion*, 822 F.2d 62 (9th Cir. 1987).

A motion to dismiss under Fed.R.Civ.P. 12(b)(6) may be granted if it appears that the petitioner can prove no facts that would entitle it to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Kenneda v. United States*, 880 F.2d 1439, 1442 (D.C.Cir.1989). The Court accepts well-pleaded facts as true and construes the petition liberally, granting a petitioner the benefit of any reasonable in-ferences that can be derived from the facts alleged. *Scheuer·v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). The Court is not required, however, to accept inferences unsupported by the facts alleged or legal conclusions that are cast as factual allegations. *Kowal v. MCI Communications*, 16 F.3d 1271, 1275 (D.C.Cir.1994).

■ Section 1963(*l*)(2) requires a party to assert "a legal interest in property forfeited to the United States" to have standing. This requirement is imposed to further the purpose of an L–Claim proceeding, which, while ancillary to the underlying criminal case, is intended to ensure that property forfeited to the United States was that of the defendant; it does not attempt to divide the defendant's estate among competing claimants. *See United States v. BCCI Holdings (Luxembourg), S.A. (In re Petition of General Creditors)*, 814 F.Supp. 106, 110 (D.D.C. 1993). This latter task is properly performed at a liquidation proceeding, where all parties without a "legal interest" in forfeited property can recover on a *pro rata* basis with the many other claimants to the debtor's estate. *Id.* at 111; *see Downriver Community Fed. Credit Union v. Penn Square Bank*, 879 F.2d 754 (10th Cir.1989), *cert. denied*, 493 U.S. 1070, 110 S.Ct. 1112, 107 L.Ed.2d 1019 (1990); *First Empire Bank–New York v. F.D.I.C.*, 572 F.2d 1361 (9th Cir.1978), *cert. denied*, 439 U.S. 919, 99 S.Ct. 293, 58 L.Ed.2d 265 (1978).

■ The critical inquiry in an L–Claim proceeding is, therefore, ownership of the disputed funds. As recognized by this Court and most, if not all, other courts addressing the issue, an unsecured creditor does not possess an interest in any specific asset of a debtor and merely has a general interest in the debtor's entire estate. *See In re Petition of Chawla*, 46 F.3d at 1191; *In re Petition of Pacific Bank*, 956 F.Supp. at 10; *see also Schwimmer*, 968 F.2d at 1581; *Campos*, 859 F.2d at 1240; *United States v. Reckmeyer*, 836 F.2d 200, 206 & n. 3 (4th Cir.1987); *Mageean*, 649 F.Supp. at 828. Because a general creditor is unable to assert an interest in a specific asset, it cannot assert a legal right, title, or interest "in property which has

been ordered forfeited" as required by § 1963(*l*)(2), at least in situations where, like here, a defendant's entire estate is not subject to forfeiture. *In re Petition of Chawla*, 46 F.3d at 1191; *see Reckmeyer*, 836 F.2d at 206 n. 3 ("It is the dilemma of linking their interest to a specific asset rather than the problem of asserting a legal interest in the debtor's estate that frustrates general creditors who attempt to contest ... forfeitures."). Accordingly, absent a showing of an interest in a specific asset, the petitioners would lack standing to assert a claim in these L-Claim proceedings.

■ Examined in light of Article 4-A of the New York Uniform Commercial Code ("N.Y.U.C.C.") and the law applicable to standing, the L-Claim must be dismissed. Whether the transaction is viewed as a debt due an MPS depositor by a BCCI depositor, or whether it is viewed as an incomplete wire transfer, the bottom line remains the same: while the petitioner has a legal cause of action arising from BCCI's failure to pay, it does not have a legal interest in a specific asset. Middle East Srl was the beneficiary to this transaction, *see* L-Claim ¶ 12; N.Y.U.C.C. § 4-A-103(1)(b), making MPS the beneficiary bank. N.Y.U.C.C. § 4-A-103(1)(c).[5] BCCI(O) London was a sender, *id.* § 4-A-103(1)(e), and AEB and BNY acted as intermediary and receiving banks. *Id.* §§ 4-A-103(1)(d); 4-A-104(2).

Acceptance by a receiving bank like BNY, which has no obligation to accept a payment order, occurs when "it executes the order." *Id.* § 4-A-209(1). While intermediary/receiving bank AEB issued a payment order to intermediary/receiving bank BNY, the funds

transfer was, for whatever reason, never completed since BNY never executed the order, *id.* § 4-A-209(1), leaving title to the funds with BCCI. *Id.* § 4-A-104(1), *see United States v. BCCI Holdings (Luxembourg) S.A., et al.*, (*In re Mistaken Wire Transfer Petitioners*), 1994 WL 914460 *5 (D.D.C., Oct.28, 1994); *see also In re Petition of Pacific Bank*, 956 F.Supp. at 5, 11 (D.D.C. 1996); *Shawmut Worcester County Bank v. First American Bank & Trust*, 731 F.Supp. 57, 60 (D.Mass.1990).[6] Instead of executing the order and crediting MPS's account, BNY returned the funds to AEB and such payment was credited to BCCI London's account at AEB. BNY's actions were fully consistent with a receiving bank's obligation when a wire transfer is not completed. N.Y.U.C.C. § 4-A-402.

In sum, title to the funds simply remained with BCCI London because the wire transfer failed, and the petitioner is merely left with a cause of action against BCCI—an unsecured obligation that leaves it in the position of general creditor. Since it is the law of this Circuit that general creditors lack standing to assert claims under 18 U.S.C. § 1963(*l*), the petition will be dismissed. *In re Petition of Chawla*, 46 F.3d 1185, 1191 (D.C.Cir.), *cert. denied sub nom. Chawla v. United States*, 515 U.S. 1160, 115 S.Ct. 2613, 132 L.Ed.2d 856 (1995). Moreover, such an inability to assert a legal interest in a specific asset would undermine the petitioner's claim on the merits. *See, e.g., In re Petition of General Creditors*, 814 F.Supp. at 110-11.

### CONCLUSION

Accordingly, it is hereby

---

**5.** While the petitioner appears to base its argument on BNY being the beneficiary bank, so as to invoke the more favorable provisions of N.Y.U.C.C. § 4-A-209(2), the facts do not support such a legal conclusion. *See* L-Claim 112 (identifying Middle East Srl as the beneficiary).

**6.** While the petitioner alleges that BCCI instructed AEB to issue the payment order and concedes that the funds were returned by BNY to the account of BCCI, the L-Claim itself does not allege the fact that BNY actually accepted the payment order by executing the same. The absence of such an allegation is conspicuous. The L-Claim does state that BNY "could not apply" the order, which appears to be a concession that

BNY did not execute a payment order. The L-Claim does allege that "[t]he funds were returned to the account of BCCI solely as an operational matter, without relinquishing the ownership claims of the beneficiary." L-Claim ¶ 12. To the extent this statement is not a legal conclusion cloaked as a fact, it is nevertheless an insufficient basis upon which to reasonably infer that BNY accepted AEB's payment order by executing the same. Moreover, while BNY's repayment is inconsistent with acceptance and transfer of title, it is wholly consistent with a receiving bank's obligation to refund payment when a wire transfer fails.

**ORDERED** that the United States' motion to dismiss is granted; MPS's L–Claim is dismissed.

IT IS SO ORDERED.